**CITIZENS COALITION,
et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,**

**and**

**Georgetown University, Intervenor.**

**No. 91–AA–977.**

District of Columbia Court of Appeals.

Argued Sept. 16, 1992.
Decided Jan. 29, 1993.

Cornish F. Hitchcock, Washington, DC, for petitioners.

Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, was on the statement in lieu of brief, on behalf of respondent.

Maureen Ellen Dwyer, with whom C. Francis Murphy, Washington, DC, was on the brief, for intervenor.

Before ROGERS, Chief Judge, TERRY, Associate Judge, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

Petitioners Citizens Coalition [1] ("Coalition") seeks review of an Order of the District of Columbia Board of Zoning Adjustment ("BZA"), dated July 31, 1991, which granted special exception relief to intervenor Georgetown University ("Georgetown or the University"). The special exception permits Georgetown to construct an addition to its existing power plant to include a fifty-six megawatt Cogeneration Facility. The BZA, in approving the special exception, found the Cogeneration Facility to be an accessory use to Georgetown's operation as a University.

Based on extensive findings, the BZA concluded that Georgetown substantially complied with the criteria set forth in sections 210 and 3108.1 of the District of Columbia Zoning Regulations and granted Georgetown a special exception. The BZA reached the following conclusions: (1) the requested relief is in harmony with the general purpose and intent of the Zoning Regulations; (2) the proposed facility is designed to meet federal, local, environmental, and operational standards, (3) the facility is not likely to become objectionable to neighboring property; and (4) the facility complies with the bulk and area requirements of the Zoning Regulations. The Coalition challenges the BZA Order approving the Cogeneration Facility as a special exception on the grounds that the facility is not an accessory use to the University and cannot be permitted in a residential zone unless Georgetown obtains a use variance. We find no basis for reversal of the decision of the BZA.

## I.

## FACTUAL SUMMARY

### A. History of the Heating and Cooling Plant

Georgetown filed an application with the BZA [2] on October 18, 1990, seeking authorization for construction of an addition to its existing steam heating and cooling plant located east of McDonough Gymnasium. Georgetown planned the construction and operation of a Cogeneration Facility to be situated on the southwest quadrant of the campus, on a site east of McDonough Gymnasium which is located in an R–3 zone. [3] A cogenerator is a relatively recent concept and has the advantage that it provides steam and electric power in the same facility.

To obtain a special exception for development of property for campus purposes in an R–3 zone under the Zoning Regulations, 11 DCMR §§ 210, [4] 3108.1, a college or university must demonstrate that the proposed use "is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions." 11 DCMR § 210.2. [5]

1. Petitioners represent the Citizens Coalition, an unincorporated association of citizen groups, including the Glover Park Citizens Association, Palisades Citizens Association, Foxhall Citizens Association, Citizens Association of Georgetown, Hillendale Citizens Association, and Burleith Citizens Association, as well as individual members of these associations.

2. The application was filed after the BZA issued Order No. 15302, dated October 12, 1990, approving Georgetown's 1989 Bicentennial Campus Plan to guide campus development through the year 2010. The BZA Order approved, *in concept,* an expansion of Georgetown's existing energy plant with a 56 megawatt Cogeneration Facility. The BZA's Order was affirmed by this court in *Glover Park Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* No. 90–1394 by Order dated December 26, 1991.

3. The Georgetown University campus contains approximately 104 acres of land and is roughly bounded by Reservoir Road on the north, Glover–Archbald Park on the west, Canal Road on the south, and 35th and 36th Streets on the east. The entire campus is zoned C–1 and R–3. The proposed facility is located within the southwest quadrant of the campus and is zoned R–3.

4. Section 210 of the Zoning Regulations sets forth the special exception criteria for a college or university. *See* 11 DCMR § 210 (1987); see also Part III B., *infra* for specific criteria as set forth in the case law.

5. Additionally, the applicant (Georgetown) must satisfy the maximum bulk requirements by showing that the total bulk increases of all buildings and structures on campus do not exceed the gross floor area prescribed for the district. 11 DCMR § 210.3.

The BZA has in the past approved heating and cooling facilities on the Georgetown campus in order to meet the University's needs. In 1968, the BZA unanimously approved [6] the location of a heating and cooling plant on the campus and concluded that the location, design and operational characteristics were not likely to become objectionable to neighboring property. The initial power plant was designed to use either fuel oil, natural gas or a combination of the two.[7]

In 1977, the BZA again approved a special exception [8] to Georgetown for the construction of an 11,998 square foot addition to that existing heating and cooling plant.[9] This addition represented the first phase of the project designed to demonstrate a cost-efficient, environmentally sound system so as to make Georgetown energy self-sufficient. The second phase of the project was later set forth in Georgetown's 1983 Campus Plan [10] which detailed its future energy goals and included the implementation of cogeneration technology. Georgetown represented this as an effort to reduce the high cost of fuel, and accomplish implementation of an innovative energy investment program to serve as a national model for other academic institutions. The 1983 Campus Plan set forth the second phase which was to develop a cogeneration system designed in cooperation with local utility interests.

In 1983, the BZA accommodated the second phase of the demonstration project by approving a second addition to Georgetown's existing power plant. The 1983 BZA Order also permitted a steam turbine

driven cogenerator of 2.8 megawatt capacity constituting the first Cogeneration Facility on the Georgetown campus. Because this facility could at times deliver electricity to the Potomac Electric Power Company ("PEPCO"), the District of Columbia Public Service Commission ("PSC") required that the Cogeneration Facility furnish electricity in accordance with a Power Purchase Agreement which was approved and reviewed by the PSC. In approving that project the BZA noted that it conformed to the national energy policy of conserving fuel,[11] and that the Cogeneration Facility's location and construction would avoid any objectionable impact on neighboring property.

As part of the Power Purchase Agreement, dated January 31, 1990, and approved by the Public Service Commission, Georgetown contracted with Dominion Energy, Inc. ("Dominion"), an affiliate of Virginia Power (formerly VEPCO) whereby Dominion would construct and operate the proposed Cogeneration Facility on the Georgetown campus. Dominion in turn entered into a Power Purchase Agreement with PEPCO in which PEPCO would purchase 100% of the electricity generated by the proposed facility for the next twenty-five years. As part of its energy conservation goal, the Public Utilities Regulatory Policies Act requires PEPCO to purchase electricity from private parties who generate electricity from qualifying facilities.[12]

On October 12, 1990, the BZA approved Georgetown's 1989 Bicentennial Campus

6. Order No. 9539, dated April 8, 1968.

7. *Id.*

8. BZA Order No. 12316, dated July 21, 1977.

9. The 1977 addition was part of a demonstration project funded by a grant from the U.S. Department of Energy (formerly the Energy Research and Development Administration). The project sought to test the feasibility of high-sulfur coal for conservation purposes, including the development of new technological advances such as cogeneration.

10. BZA Order No. 13894, dated April 11, 1983; approved by a vote of 4–0.

11. This national energy policy is established by the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117 (1978) (codified at 16 U.S.C.A. § 824a–3 (1985 & Supp. 1992) (specific provision dealing with qualification of cogeneration facilities and sale of electricity to utility company) ("PURPA").

12. *See American Elec. Power Serv. Corp. v. Federal Energy Regulatory Comm'n,* 675 F.2d 1226, 1229–32 (D.C.Cir.1982) (discussing qualifying status for cogeneration facilities and obligation of utility company to purchase available electricity), *rev'd on other grounds,* 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983).

Plan.[13] In so doing, the BZA approved, *in concept*, the proposed fifty-six megawatt Cogeneration Facility, but the BZA made clear that Georgetown must return for special exception approval of the proposed facility. Accordingly, the BZA required Georgetown to submit a separate application setting forth the design details, including capacity, and the specific impact of such a facility. In compliance with the BZA directive, Georgetown filed an application for a special exception to allow for the construction of an addition to the existing power plant in order to house the fifty-six megawatt Cogeneration Facility. After a hearing, the BZA approved Georgetown's application on July 31, 1991 applying 11 DCMR §§ 210, 3108.1, which sets forth the criteria that a University must satisfy in order to obtain a special exception. The Coalition Petitioners now challenge the BZA's grant of the special exception.

## B. The Cogeneration Process

The BZA credited evidence presented by Georgetown that the Cogeneration Facility would meet Georgetown's present and future energy demands and further the academic mission of the University.[14] Specifically, cogeneration technology simultaneously produces steam and electricity from a single energy source which can satisfy demands for steam, chilled water and electric power. The proposed plant has the capacity to generate fifty-six megawatts of electricity. The existing previously approved cogenerator has only a 2.8 megawatt capacity. Georgetown estimates that it will have peak loads of thirty-six and fifty-two megawatts respectively, in the years 2000 and 2010. Georgetown officials established that the University needed to expand its steam and chilled water capacity, using the steam for on-campus heating,

air conditioning, hot water, cooking and sterilizing, followed by plant use for pumps and processing. The steam generated by the proposed facility provides the energy source for chilled water used in air conditioning. The BZA found that Georgetown has currently reached its chilled water capacity, and therefore has an immediate need for additional equipment in order to increase that capacity before any additional construction can take place on campus.

All of the steam produced by cogeneration would be used to meet the University's present needs, but the proposed facility would initially generate a surplus of electricity over the University's present demands. The proposed Cogeneration Facility would not provide a *direct source* of electricity for the University because all electricity produced by cogeneration would be sold to PEPCO's grid.[15] In order to channel to the University buildings the electricity generated by the proposed facility, Georgetown would have to construct extensive duplicate switching and distribution facilities to provide a level of safety and reliability comparable with that presently provided by PEPCO. Additionally, the BZA found that

even if the construction of the appropriate facilities were practical, the University would be forced to contract with PEPCO for back-up service in case of malfunction and for scheduled maintenance outages. The back-up contract with PEPCO would require PEPCO to hold the needed capacity in reserve within its system for University use. The cost of such back-up contract would add several hundred thousand dollars to the University's energy costs and the necessity of PEPCO to generate and maintain such reserves within its system would negate

---

**13.** BZA Order No. 15302,® dated October 12, 1990; approved by a vote of 5–0.

**14.** According to evidence presented by Georgetown, a part of its academic mission has included seeking to lead other academic institutions by developing demonstration projects fielding new technology for energy conservation and to protect the environment. Such projects, according to Georgetown, represent the foundation of

its congressionally recognized National Exemplar Integrated Community Energy Systems project ("NEICES").

**15.** In the context of electricity, grid is defined as "[a]n interconnected system of electric cables and power stations that distributes electricity over a large area." The American Heritage Dictionary, at 579 (New College Edition 1976).

the environmental benefits which would result from cogeneration. BZA Finding No. 25.

The BZA findings relate that for technical, economic and public interest reasons, the cogenerated electricity would be delivered to the PEPCO grid rather than being delivered directly to the Georgetown campus. PEPCO's distribution uses a radial system, and the Georgetown campus has eight feeders. The PEPCO system does not allow interconnection of the feeders. As a result, it is not feasible from a practical or financial perspective to directly deliver electricity generated from the proposed facility to the Georgetown campus.

A plan utilized to move power from one utility company to another, called "wheeling," could technically deliver the same power back to Georgetown. As explained at the BZA hearing, under the wheeling method

> where you have electricity somewhere and you want it delivered to a customer somewhere else and you don't have any right of eminent domain to build lines, so you make a contract with the utility company and they save some space on their transmission and, for a cost, they deliver your power. They don't deliver those same electrons or those same amperes. They measure how much you put into the system, they measure how much the customer took out, and you get what you put in and they charge you for the use of their facility.

Georgetown established that if a line could be connected to the Georgetown substation, then the University could transmit the generated electricity into the substation and PEPCO could deliver this electricity back to Georgetown. A Georgetown official explained, however, that PEPCO, like most utility companies, does not have a provision for wheeling. Further credited testimony indicated that PEPCO and most utility companies are averse to wheeling which is generally utilized among utilities and across utility systems rather than utilized by private entities. For these reasons, the BZA accepted Georgetown's testimony that "it is not technically, operationally or economically feasible to provide electricity directly from the proposed cogeneration facility" to Georgetown. BZA Finding No. 25.

## II.

### THE COALITION'S CONTENTIONS

*A. The Cogeneration Facility as a Commercial Venture*

The Coalition contends that Dominion's presence on the University campus represents a commercial intrusion in a residential zone because the electricity generated from the plant would not be delivered directly to Georgetown, but would instead be sold entirely to PEPCO. The Coalition argues that the Cogeneration Facility would therefore generate electricity for commercial sale and profit, and thus fails to constitute a valid accessory use to the mission of the University. The Coalition reasons that the proposed facility is a purely commercial venture and thus is not incidental to University use. Further, the Coalition argues that a Cogeneration Facility is inappropriate for an R–3 zone and therefore nonconforming to other similar uses in the residential area, and thus Georgetown must seek a use variance [16] from the BZA as well as a special exception.

*B. The Capacity of the Cogenerator Facility and Incremental Construction*

Next, the Coalition contends that Georgetown's purpose in its arrangement with

---

**16.** D.C.Code § 5–424(g)(3) (Repl.1988) sets forth the criteria for variances and provides in relevant part:

Where, by reason of exceptional narrowness, shallowness, or shape of a specific piece of property ... or by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation ... would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve the difficulties or hardship....

*Id.* See also *Foxhall Community Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 524 A.2d 759, 761 (D.C.1987) (discussing the hardship requirement for a variance).

Dominion to operate the proposed facility is not merely to serve University needs, but to institute a commercial venture in order to take advantage of the federal program that compels utility companies to purchase electricity produced by cogeneration facilities meeting the applicable standards. The Coalition maintains that a more modest facility could have been planned to satisfy Georgetown's utility demands.

At the hearing, the Coalition introduced an energy consultant who testified that a twenty megawatt facility would adequately meet Georgetown's current heating and cooling needs. However, there was substantial evidence to support the finding that incremental development over the years of the proposed facility would increase the project costs by a minimum of 25% (or $18 million). Georgetown offered evidence to establish that: (1) the University's steam needs would require a facility with thirty-four megawatts capacity in 1993; (2) the University would require additional steam capacity by the year 2000; and (3) the physical size, equipment and stack of a smaller facility would be virtually identical to that of the proposed facility.

The Coalition further contends that the proposed facility represents an industrial-scale power plant, and thus is inappropriate for a residential environment. In addressing the concerns raised by the Advisory Neighborhood Commission 2E (Finding No. 51b) regarding the size of the facility, the BZA found "[t]he capacity of the proposed facility is appropriate given the University's need to meet its peak projected needs for steam, chilled water, and electricity *over the life of the project....*" BZA Finding No. 60d (emphasis supplied). As a matter of passing interest Advisory Neighborhood Commission ("ANC") 2E, which includes Georgetown University within its borders, was unable to reach a consensus and took no official position on the application.

The BZA further found that the University will utilize approximately 70% of the *overall* capacity of the facility to meet the demand for steam, chilled water and electricity during the initial year of its operation. But as to electricity alone, Georgetown will use approximately 93% by the year 2010. In sum, the BZA was not persuaded that incremental development was unreasonable given the University's immediate and future demands for energy.

III.

DISCUSSION

A. *The Scope of Review and Related Concerns*

■ The District of Columbia Administrative Procedure Act ("DCAPA") § 1–1509(e) (Repl.1987) sets forth the applicable standard in this Court's consideration of the validity of the BZA's findings. It requires that all agency decisions must be accompanied by written "[f]indings of fact and conclusions of law [which] shall be supported by and in accordance with reliable, probative, and substantial evidence." [17]

Three requirements are inherent in this "substantial evidence" test which has been articulated by this court: (1) findings must be made on each contested issue of fact; (2) the decision must rationally follow from the facts; i.e., there must be a " 'rational connection between the facts found and the choice made.' " *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 41 (D.C.1979) ("*Citizens I*" ) (quoting *Brewington v. District of Columbia Bd. of Appeals & Review,* 299 A.2d 145, 147 (D.C.1973)); and (3) there must be sufficient evidence to support each finding, i.e., " 'such relevant evidence as a reasonable mind might accept as adequate....' " *Citizens I, supra,* 402 A.2d at 41 (quoting *Vestry of Grace Parish v. District of Columbia Alcoholic Beverage*

---

**17.** DCAPA § 1–1509(e) provides in part:
Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact....
*Id.*

*Control Bd.,* 366 A.2d 1110, 1112 (D.C. 1976)).[18]

■ This court is not to substitute its judgment for that of the agency, and thus the decision of the BZA will be upheld provided there is a rational basis for it. *Citizens I, supra,* 402 A.2d at 44; *Silverstone v. District of Columbia Bd. of Zoning Adjustment,* 372 A.2d 1286, 1288 (D.C. 1977), *aff'd,* 396 A.2d 992 (D.C.1979). It is the agency's, i.e., the BZA's, responsibility to interpret the Zoning Regulations and the agency's interpretation is controlling unless it is plainly erroneous or inconsistent with the regulations. *Dietrich, supra* note 18, 320 A.2d at 286 (citing *Taylor v. District of Columbia Bd. of Zoning Adjustment,* 308 A.2d 230, 233 (D.C.1973)).

■ A decision by the BZA will not be set aside if: (1) the decision is accompanied by findings of fact sufficient to enable the reviewing court to reach a decision; (2) the decision reached by the agency follows as a matter of law from the facts; and (3) the facts so stated have substantial support in the evidence. *Citizens I, supra,* 402 A.2d at 41 (citing *Saginaw Broadcasting Co. v. Federal Communications Comm'n,* 68 App.D.C. 282, 287, 96 F.2d 554, 559, *cert. denied,* 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938)).

■ Accordingly, our scope of review is "limited to whether the Board's interpretation is legally consistent with the regulations and whether the decision is clearly arbitrary and capricious in both a factual and a legal context." *Salsbery v. District of Columbia Bd. of Zoning Adjustment,* 318 A.2d 894, 896 (D.C.1974) (citations omitted).

*B. The Grant of the Special Exception for the Cogeneration Facility*

■ Under Section 210 of the Zoning Regulations a university, or an addition to a university, may not be located in a residential zone as a matter of right. The BZA, however, may grant a special excep-

tion for a university to arrange for an addition provided that certain conditions are met. *See* 11 DCMR §§ 210.2, 210.3. *See also Glenbrook Road Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 26 (D.C.1992) (evidence supported the BZA's grant of a special exception for the construction of a new law school building on the American University campus); *Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment,* 403 A.2d 737, 738 (D.C.1979) (*"Citizens II"*) (zoning board properly found that campus plan would not worsen traffic conditions in the area); *Dietrich, supra* note 18, 320 A.2d at 283 (requirements for special exception were satisfied to permit a private high school to be located in median density apartment house).

The fundamental issue in this case is whether the BZA erred in granting a special exception on the ground that the Cogeneration Facility constitutes an accessory use to University operations.

The Georgetown campus is located in an R–3 zone which comprises high and low density districts and is designed essentially for row dwellings and single-family homes. 11 DCMR §§ 200.3, 320.1 (1987). As stated, Georgetown may not construct an addition for a power plant as a matter of right in such an area. The BZA, however, may grant a special exception for Georgetown to arrange construction for the proposed Cogeneration Facility provided the following conditions are met: (1) "where, in the [judgment] of the Board those special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Maps" 11 DCMR § 3108.1 (1987); (2) the exception "will not tend to affect adversely the use of neighboring property" *id.;* (3) the proposed use is located "so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions" 11 DCMR § 210.2 (1987); and (4) "the total bulk of all buildings and structures on the campus shall not

---

**18.** *See generally Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 320 A.2d 282 (D.C. 1974); *Marjorie Webster Junior College, Inc. v.* *District of Columbia Bd. of Zoning Adjustment,* 309 A.2d 314 (D.C.1973).

exceed the gross floor area prescribed for the ... district." 11 DCMR § 210.3 (1987). *See also Glenbrook Road Ass'n, supra,* 605 A.2d at 26; *Citizens II, supra,* 403 A.2d at 742–43; *Dietrich, supra* note 18, 320 A.2d at 283.

■ The Coalition's argument is based partially on a letter written by the Zoning Administrator who, after initially advertising Georgetown's proposal as a special exception case, stated that Georgetown should seek both a special exception and a use variance. The Zoning Administrator believed that Georgetown should apply for a variance because, assertedly, the initial use proposed for the Cogeneration Facility would exceed a University use. The difference between a use variance and a special exception is that a special exception is granted if the proposed use will be "in harmony with the general purpose and intent of the Zoning Regulations,"[19] whereas a variance is granted to allow a use that ordinarily would be prohibited by the zoning regulations. 11 DCMR § 3107.2 (1987). To obtain a variance, the applicant must demonstrate that an undue hardship or an extraordinary situation would result if the Zoning Regulations were applied.[20] *See id.*

The BZA disagreed with the Zoning Administrator and the Coalition on this score. The BZA found that central utility plants are common to university campuses and are related to the principal use of the site. The BZA concluded that the proposed plant was designed to meet the present and future needs regarding steam, chilled water capacity and electricity. Further, the BZA reasonably concluded that such a facility would not threaten the dominant use of the property as a University. The BZA also noted that a Cogeneration Facility was approved *n concept* in both the 1983 and 1990 Campus Plans.

1. The Cogeneration Facility Poses No Adverse Effects to Neighboring Property

■ In reviewing applications for a special exception, the BZA function is to determine whether the proposed exception satisfies the requirements under sections 210 and 3108.1 of the Zoning Regulations, such that the exception will not adversely affect neighboring property, the environment, or present objectionable conditions. The applicant, Georgetown, has the burden of demonstrating that the proposed facility will not have an adverse effect to neighboring property by increasing the level of noise, traffic, number of students, or causing other detrimental conditions. *First Baptist Church v. District of Columbia Bd. of Zoning Adjustment,* 432 A.2d 695, 698 (D.C.1981); *Stewart v. District of Columbia Bd. of Zoning Adjustment,* 305 A.2d 516, 518 (D.C.1973). Once the applicant makes the requisite showing, the BZA will ordinarily grant the special exception. *First Baptist Church, supra,* 432 A.2d at 698; *Stewart, supra,* 305 A.2d at 518.

Noting that the proposed facility would not be visible from any University boundary, the BZA found that

[t]he proposed facility is removed approximately 750 feet from the Foxhall neighborhood to the west; approximately 1,000 feet from the medical facility to the north; approximately 450 feet from the nearest on-campus residential facility and 1,300 feet from the Georgetown neighborhood to the east; and approximately 800 feet from Canal Road to the south. The closest proposed residential hall will be located approximately 300 feet from the facility.

BZA Finding No. 30.

The BZA reasonably concluded from the evidence that the special exception would not adversely affect the use of neighboring property because Georgetown "took into consideration the impact of the facility due to its proximity to the residential community, as well as on-campus housing and patient care facilities." *Id.*

2. The Level of Noise Generated by the Proposed Facility

As to an increase in the level of noise from the proposed facility, the BZA found

---

19. 11 DCMR § 3108.1 (1987).

20. *See* DCMR § 3107.2, and D.C.Code § 5-424(g)(3), *supra* note 16.

that the facility would fully comply with the District of Columbia Noise Regulations which require the sound level not to exceed sixty decibels during the daytime hours and fifty-five decibels during the nighttime hours as measured from the property lines. Georgetown offered evidence to establish that the noise levels to be generated by the facility would be mitigated by: (1) the wooded area separating the facility from the closest residence located approximately 775 feet away; (2) the suppression equipment to be used with the operation of the facility; and (3) the distance between neighboring residences and the campus property lines. In sum, the BZA found that the "facility has been designed to mitigate and minimize any potential impact due to noise generated during operation of the facility." BZA Finding No. 32. The BZA also found that the proposed facility would cause a decrease in truck trips being made to and from the campus, which would result in less noise in the area. (See III C. 4., *infra* for further explanation on truck reduction).

3.  The Energy Demands of the University

The BZA also found the capacity of the proposed facility to be appropriate in meeting the University's peak projected needs for chilled water, steam and electricity over the life of the project. The BZA rejected the Coalition's request for a plan with incremental additions to the facility, suggesting as it did that a smaller cogeneration system be installed instead. The BZA concluded that incremental development of the facility was not a reasonable alternative given the University's present and future demands for steam and electricity.

Based on Georgetown's testimony at the hearing, the BZA found that in 1993, the steam demand by the University will require a facility of thirty-four megawatts. By the year 2000, the University would require a new facility capable of additional steam capacity. It was estimated that the construction costs of the smaller facility would be approximately 80% of the cost of the proposed facility, yet would operate at only 60% of the capacity of the proposed

system. The BZA also noted that "the physical size of the facility, equipment, clearances, and stack would be virtually the same for a reduced capacity cogenerator as the proposed facility." BZA Finding No. 27. Further, Georgetown estimated and the BZA found that the University will save approximately $11 million in capital costs and between $500,000 to $1 million annually on utility bills through implementation of the particular cogeneration process being sought.

4.  District of Columbia Recommendations

The BZA took into consideration the District of Columbia Office of Planning's ("OP") recommendation that the application for the Cogeneration Facility be approved with certain conditions. The District of Columbia Office of Planning recommended approval of the special exception provided that the proposed facility meets the criteria of the Environmental Protection Agency, the Department of Consumer and Regulatory Affairs and the Commission on Fine Arts. The BZA also recognized that the District of Columbia Energy Office "was of the opinion that the proposed [C]ogeneration [F]acility contributes to the conservation of energy and promotes the energy goals and policies of the District of Columbia." BZA Finding No. 46.

In so doing, the BZA concluded that the proposed facility substantially complied with the bulk and area requirements of the Zoning Regulations. The BZA agreed with the OP's conclusion that

> the proposed cogeneration facility was generally in compliance with the University's energy goals as evidenced by its existing facility, prior applications before the Board, and its approved campus plans; that the size of the proposed facility is appropriate in terms of reliably meeting the University's projected energy needs and minimizing impacts with regard to noise, traffic and emissions; ... that the facility will fall well within the permitted floor area ratio requirements of 1.8; and, that the project will

not create any objectionable environmental impacts. . . .

BZA Finding No. 42.

5. The Environmental Benefits of the Cogeneration Facility

Finally, the BZA found there were significant public benefits which the proposed facility would provide such as reduction in emissions from the existing power plant leading to improved air quality. Presently, the power plant utilizes a coal-fired burner and natural gas/oil-fired boilers. The proposed facility would implement natural gas as its primary fuel and place the natural gas/oil-fired boilers on standby using a low sulfur fuel oil as an alternate. Additionally, the proposed facility would effect a reduction in present truck traffic by approximately 70% due to a reduction in solid waste generation effected by the proposed facility.

The BZA further noted that due to its location, adjacent to a hill, the proposed facility will not be visible from any University boundary. While the ninety foot stack of the proposed facility will be visible, the BZA found that the "stack should have minimal impacts on the skyline of the area because it is approximately (ninety) feet lower than the existing landmark Healy Tower and is of lesser size and height than two existing stacks for the flour mill and utility plant east of the Key Bridge." BZA Finding No. 31.

The BZA recognized Georgetown's preparation of an Environmental Impact Statement ("EIS") regarding the proposed facility to demonstrate compliance with environmental regulations. Georgetown submitted an application under the Environmental Policy Act, and a public hearing was held on February 27, 1991. The impact statement was presented for regulatory review by the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") and the Environmental Protection Agency ("EPA"). Georgetown also submitted an air permit application to the DCRA and the EPA. Based on recommendations from both agencies, Georgetown refined and consequently improved the project by reducing emission levels. As a result, "the project is now classified as a minor modification with respect to the air permit process." BZA Finding No. 33. In its conclusion, the BZA conditioned its approval for the special exception on the proposed facility's compliance with all federal and local air quality regulations and air permit requirements.

C. The BZA's Determination that the Cogeneration Facility Is an Accessory Use to University Operations·

We turn now to the principal issue, i.e., whether the Facility is an accessory use to the operation of the University. Section 199 of the Zoning Regulations defines accessory use as "a use customarily incidental and subordinate to the principal use, and located on the same lot with the principal use." 11 DCMR § 199 (1987). Section 321.1 of the Zoning Regulations further defines accessory use for an R–3 zone as those accessory uses or buildings incidental to permitted uses. 11 DCMR § 321.1(b) (1987).

1. The Cogeneration Facility Is Customarily Incidental and Subordinate to the Principal Use

The fundamental issue in this case is whether the proposed Cogeneration Facility constitutes an accessory use which is customarily incidental and subordinate to the principal use of the University. The Coalition contends that the proposed facility fails to constitute an accessory use, and thus Georgetown must seek a variance from the prescribed Zoning Regulations. The issue presented by the Coalition before this court is not whether Georgetown may construct a power plant which is sized to directly meet the current needs of the University. Rather, the Coalition focuses on the electricity generated by the proposed facility which will not be used *directly* by Georgetown, but instead will be transmitted by a third-party (Dominion) to serve PEPCO's demand. PEPCO can then sell any surplus electricity not used by Georgetown to its customers. The Coalition argues that this arrangement is a purely commercial venture, and thus cannot be

considered as an accessory use to University operations.[21]

a. *The Power Purchase Agreement*

The three-sided arrangement among Georgetown, Dominion, and PEPCO is obfuscated by the abstract nature of the use involved, i.e., the transfer of electricity from Georgetown to PEPCO's grid. It is first necessary to trace the route of the electrical transmission. The Power Purchase Agreement between Dominion and PEPCO sets forth the path of the electrical flow whereby Dominion as "seller" will design, construct, operate and maintain the proposed Cogeneration Facility on the campus. The proposed facility would interconnect with PEPCO's electric transmission system for the production of steam to Georgetown and the generation and sale of electricity to PEPCO. Dominion, as seller, would sell all of the electricity generated by the proposed facility to PEPCO, who in turn would purchase 100% of the electricity generated by the facility for twenty-five years.[22]

More particularly, Georgetown would deliver the electricity, via Dominion, generated by the proposed facility to PEPCO's grid and draw from the grid the electricity that it consumes. The electrons delivered to PEPCO's grid are not the *same* electrons Georgetown would receive from PEPCO, so to speak. Any electricity which Georgetown does not draw from the PEPCO grid would be sold to other PEPCO customers, though in decreasing amounts as Georgetown's power needs increase. It is this sale of electricity, generated by the proposed facility, to non-university customers which is the focal point of the Coalition's argument that such a sale is not accessory to Georgetown's mission as a University.

The BZA found that the interchange of electricity generated by the proposed facility did not affect the nature of the use. The BZA noted that Georgetown elected

the cogeneration process because it: (1) was the most cost-effective; (2) furthered local and national policy goals of promoting cogeneration; and (3) was environmentally sound. Georgetown asserted that when faced with the choice of updating the existing plant or implementing a cogenerator, the University opted for the latter to accomplish all three of the benefits it initially sought.

The BZA concluded that the proposed facility would be accessory to the principal use of the University. Like food sold in a cafeteria to students, the energy generated by the facility, used to heat dormitories, classrooms, a hospital, and other campus buildings, would also be for the benefit of the students, and thus serve as an accessory use to the principal function of the University. In rejecting the Coalition's argument that the proposed facility constituted a commercial use, the BZA found

> [t]he sale of the electricity generated by the proposed facility to PEPCO results from the applicant's analysis of the best approach to most efficiently implement the benefits available through the cogeneration process and does not render the facility a commercial use.

BZA Finding No. 60c.

Even if the proposed facility constituted a commercial use on the University campus, the BZA noted that

> ... commercial uses are not inappropriate on university campuses provided that they are in furtherance of the University's essential mission and that they do not have substantial adverse impacts on the surrounding community.

*Id.*

Consequently, the BZA found the proposed use of electricity by the facility to be an accessory use and thus rejected the Coalition's argument that the facility would require a variance. In describing the nature of the use, the BZA found that the

---

**21.** The financial structure of the arrangement provides that Dominion sells all the electricity generated by the facility to PEPCO, and that PEPCO expects to recover these payments from its customers on a current basis via rates authorized by the regulatory agencies in regard to

PEPCO's sales. Power Purchase Agreement, dated January 31, 1990.

**22.** Power Purchase Agreement, dated January 31, 1990.

"fact that the cogeneration process provides for the interchange of the electricity generated by the facility with PEPCO does not change the nature of the use which has existed on campus for a number of years." BZA Finding No. 60b.

Additionally, the BZA found that their prior decisions recognized a cost-effective utility service to be "an integral component of providing energy for University operations." BZA Finding No. 59a. The BZA noted that Georgetown has had a history of campus power plant usage. For example, it has maintained a coal-fired power plant at the subject site since 1968, and the BZA approved the proposed Cogeneration Facility, in concept, in both the 1983 and the 1990 Campus Plans.

### b. The Impact of an Accessory Use on the Surrounding Neighborhood

The most common theme running through the case law is the degree of impact an accessory use has upon the surrounding community. 3A N. WILLIAMS, AMERICAN LAND PLANNING LAW § 74.16, at 231 (1985). According to Williams, "[m]any courts place primary emphasis, in these cases, on whether an accessory use really has an undesirable influence on the neighborhood—which is the most reasonable basic criterion to use in such cases. The degree of impact upon the surrounding residential neighborhood is the most reasonable test of the appropriateness of an accessory use...." *Id. See also City of Muskegon Heights v. Wilson,* 363 Mich. 263, 109 N.W.2d 768, 770 (1961) (factors considered in determining accessory use include customs and practices of the community, traffic, both personal and vehicular, and the effect of the business on the tranquility and residential character of the neighborhood); *State ex rel. Kaegel v. Holekamp,* 151 S.W.2d 685 (Mo.App.1941) (zoning restrictions are designed to promote the public health, safety and the general welfare of the community; thus a use must conform to this standard).

The Coalition points us to several cases which illustrate the impact an accessory use has upon the surrounding neighborhood. In determining whether a proposed use met this criterion, one court focused on the contribution of the use to the general welfare of the neighborhood. In *Charlie Brown of Chatham, Inc. v. Board of Adjustment for the Township of Chatham,* 202 N.J.Super. 312, 495 A.2d 119, 125 (1985), the court held that the provision of sleeping accommodations for restaurant employees arranged by the restaurant owner did not constitute an accessory use because such a use was not reasonably related to the operation of a restaurant.

The court reasoned that while it was more profitable for the restaurant owner to house key employees over the restaurant, the proposed use did not meet the general welfare provisions involving uses which inherently serve the public good. *Id.* at 128. Further, the court used the expansion of a school building as an example of an "inherently beneficial" use which promoted the general welfare of the community. *Id.* In distinguishing among types of uses, the court made clear that "[w]here the use is not of the type which of itself provides special reasons, such as a *school* or hospital, there must be a finding that the general welfare is served because the use is peculiarly fit for the particular location...." *Id.* (emphasis supplied).

■ The facts and holding of the *Charlie Brown of Chatham, Inc.* case, are inapposite to this case because a University seeking to provide a power plant on its campus to serve the University's energy needs bears a reasonable relation to the University use. As set forth in *Charlie Brown of Chatham, Inc.,* uses which serve the general welfare are either an " 'inherently beneficial' use customarily of a quasi-public nature" or "a use which serves the public to some degree, but not inherently so." *Id.* at 128. Examples of uses which inherently serve the public good are schools or hospitals. *See id.* The operation of a central utility power plant (generating electricity to Georgetown medical center) is the type of use which itself provides "special reasons" that are incidental to the operation of a University.

A case (not cited by the Coalition) which focused on the degree of impact an accessory use has upon the neighborhood is *Kushner v. Lawton*, 351 Ill.App. 422, 115 N.E.2d 581 (1953). In that case, the court approved a license for the operation of a retail shop selling foods and drug sundries in an apartment building as customarily incidental and accessory to the permitted use. The impact on the community proved to be a determining factor for the court which stated that "[t]he shop, being confined to the interior of the building, with neither windows, doors nor advertising on the street ... cannot be injurious to the district from a health, moral or aesthetic standpoint." *Id.* at 583.

In response to the degree of the impact on the neighborhood here, the BZA found that the proposed facility would "not have substantial adverse impacts on the surrounding community." BZA Finding No. 60c. Further, the BZA found that the Cogeneration Facility would conform with other buildings in the school area. The BZA noted that

> [t]he proposed addition has been designed to match the existing facility and nearby structures in terms of building materials and detail. The site is proposed to be constructed of brick and concrete and will be landscaped in accordance with the landscape plan approved as part of the University's Bicentennial Campus Plan.

BZA Finding No. 29.

Under this reasoning, the proposed facility would not pose an undesirable influence on the neighborhood. In fact, the facility would improve the air quality by reducing toxic emissions from the existing power plant, by upgrading pollution control devices on the campus and by reducing truck traffic. The BZA indicated that the modernization of the existing power plant through the implementation of cogeneration technology will result in a shift from the existing coal-fired burner to using natural gas as its primary fuel. The BZA found that

> [t]hese changes will produce reductions in emissions from the existing central

utility plant, leading to improved air quality and other environmental improvements. The project will result in a reduction of carbon dioxide emissions by 61%, a reduction of nitrogen oxide emissions by 41% and a reduction of sulfur dioxide emissions by 33%.

BZA Finding No. 34.

Specifically, the BZA found that the proposed facility will upgrade the pollution control devices by replacing two existing fuel storage tanks with a state of the art fuel oil storage system for back-up purposes in the event of possible interruptions of fuel services. The BZA noted that

> [t]he new storage tank will be equipped with a leak detection monitoring system and will conform with EPA underground storage tank regulations resulting in a higher degree of protection than required by Federal and local regulations. The basic and acidic materials used to neutralize wastewater will be stored in tanks located inside the building over concrete pads with a berm sized to contain the entire contents of the tank to mitigate any possible adverse conditions on campus or to nearby properties.... The ammonia used in the proposed facility is aqueous ammonia ... which is at least 70% water, [and] presents a lower hazard level than anhydrous ammonia....

BZA Finding No. 35.

Consequently, the BZA found reasonably that the proposed facility will not present objectionable conditions to the neighborhood, but will instead improve the air quality, contribute to upgrading pollution control devices on the campus, reduce toxic emissions and the level of truck traffic.

### 2. The Cogeneration Facility Is Reasonably Related to University Use

The Coalition's basic contention is that an accessory use must be limited to the exclusive use and benefit of the owner or occupant of the property and must not be intrusive or obnoxious to one's neighbors. The Coalition refers us to a series of decisions.

In *Cord Meyer Dev. Co. v. Bell Bay Drugs, Inc.*, 25 A.D.2d 744, 269 N.Y.S.2d

67 (Dep't 1966), *rev'd on other grounds*, 20 N.Y.2d 211, 282 N.Y.S.2d 259, 229 N.E.2d 44 (1967), the court held that a commercial pharmacy could not be operated as an accessory function to a doctor's office. 269 N.Y.S.2d at 69. In *Dolan v. De Capua*, 13 N.J.Super. 500, 80 A.2d 655 (1951), the court held that a parking garage permitted as an accessory use in a residential district could not be used to store oil trucks, buses and the like because such uses were unrelated to a single-family dwelling. *Id.* at 659. Also in *Currey v. Kimple*, 577 S.W.2d 508 (Tex.Civ.App.1978), the court concluded that a private tennis court was an accessory use to a single-family dwelling provided it did not involve public or business activities. *Id.* at 514.

■ The Coalition's analogy misses the mark. A pharmacy in a physician's office, a parking garage in a private home and a private tennis court in a single-family dwelling neighborhood cannot reasonably be likened to a power plant used to generate steam and electricity for the purpose of operating a University (and a University Hospital). Unlike those cases, here, the accessory use, i.e., the proposed facility, is attendant and reasonably related to the principal use which is the function and operation of a University as it contributes to the health and well-being of its students and the Hospital patients and personnel.

The Coalition refers us to *Town of Salem v. Durrett*, 125 N.H. 29, 480 A.2d 9, 10 (1984), where a property owner used a portion of his land located in a rural zoning district as a landing strip for his private airplane. The property owner owned ten acres of land and lived in a house situated on the property. He was a commercial pilot and used the landing strip in commuting to work and flying to a farm that he owned in West Virginia. *Id.* The court determined that the use of an airstrip was not customarily associated with the owner's land which was used principally as his residence. *Id.* at 11. In applying the customary usage test, the court reasoned that "the use of private aircraft had not become so prevalent as to be customarily incidental to the residential use of property." *Id.* at 12.

Here, however, the BZA found reasonably that the proposed Cogeneration Facility is customarily incidental to the principal use, i.e., the operation and function of a University. The BZA found from substantial evidence that "the provision of a central utility plant is common on university campuses in the city and is therefore related to the principal use of the site." BZA Finding No. 59a. The BZA also found that the University has a history of power plant usage at the site dating back to 1968. Further, the BZA noted that the proposed facility would not threaten the principal use of the property as a University.

■ The Coalition points us to *7–11 Tours, Inc. v. Board of Zoning Appeals of the Town of Smithtown*, 90 A.D.2d 486, 454 N.Y.S.2d 477 (Dep't 1982), where the court affirmed the lower court's decision that a travel agency serving the public was not an accessory use to a motel. The court defined "incidental" as a use which "must also incorporate the concept of reasonable relationship with the primary use. It is not enough that the use be subordinate; it must also be attendant or concomitant." *Id.* at 478. The court determined that a travel agency open to the public was not commonly or habitually established as reasonably associated with the primary use of a motel. *Id.*

■ In contrast to these cases, the BZA concluded, and we agree, that the operation and construction of a Cogeneration Facility used to serve University utility demands bears a reasonable relation and is thereby incidental and subordinate to University operations. Unlike the cases relied upon by the Coalition, a power plant provided by a University to meet its utility demands bears a reasonable relation to the University, and is an inherently beneficial use of a quasi-public nature serving the principal use of University operations, including the school and the Hospital.

3. The Cogeneration Facility Is Located on the Same Lot with the Principal Use

An additional element of the "accessory use" test provides that the use be "located

on the same lot with the principal use." 11 DCMR § 199 (1987). The Coalition asserts that because a portion of the electricity generated by the proposed facility and fed into PEPCO's grid will not be used exclusively by Georgetown, but instead will be sold to PEPCO customers, even though in amounts decreasing through the years, the use is not accessory. Further, the Coalition contends that the use will not be located on the same lot with the principal use. The Coalition argues that our decision in *Hilton Hotels Corp. v. District of Columbia Bd. of Zoning Adjustment,* 363 A.2d 670 (D.C.1976), *subsequent opinion,* 435 A.2d 1062 (D.C.1981), is controlling on this issue, to the detriment of Georgetown.

*Hilton, supra,* involved the operation of a laundry facility on the premises of the Statler–Hilton Hotel which originally was used exclusively for the processing of its own laundry. Sometime later, the Statler–Hilton began processing the laundry of the Washington–Hilton Hotel located approximately one mile away. Both hotels were owned by the same corporation. A cooperative apartment building across the street from the Statler–Hilton complained of "frequent deliveries of laundry" to and from the hotel which caused traffic congestion and "the impeding of pedestrians." *Hilton, supra,* 363 A.2d at 671.

This court upheld the BZA's decision that although the operation of the laundry on the hotel premises was accessory to the *Statler*–Hilton, it was not accessory to the *Washington*–Hilton because that hotel was located about a mile away. *Id.* The Coalition's reliance on *Hilton, supra,* is misplaced because that case supports the narrow holding that an accessory use must be on the same lot as the principal use of the property pursuant to Zoning Regulations.

Here, the proposed facility would be an addition to the existing power plant currently located on the campus. The BZA found that "[t]he subject property is located on the Georgetown University cam-

pus...." BZA Finding No. 2. Additionally, the BZA noted that Georgetown requests a special exception under an approved campus plan for "the construction of an addition to its central utility plant...." BZA Finding No. 3. Clearly, the BZA's findings effectively demonstrate that the location of the proposed facility is on the same lot as the University and thus are not "arbitrary and capricious in both a factual and legal context." *Salsbery v. District of Columbia Bd. of Zoning Adjustment,* 318 A.2d 894, 896 (D.C.1974), *aff'd,* 357 A.2d 402 (D.C.1976). The electricity itself eventually will leave the lot under the Agreement between PEPCO and Dominion. But this will not cause objectionable conditions to the neighborhood like a laundry truck making periodic and obstructive deliveries as in *Hilton, supra.* Accordingly, the Cogeneration Facility satisfies the second prong of the "accessory use" test as set forth in *Hilton, supra,* 363 A.2d at 671.

### 4. The Accessory Use Must Not Be Detrimental to the Environment

A significant factor in the accessory use analysis concerns the detrimental effect a proposed use might have on the neighborhood. Unlike in *Hilton, supra,* where the increased traffic became an objectionable condition of the laundry operation, the Cogeneration Facility would have more nearly a benign effect on the neighborhood. The BZA found that the proposed facility would decrease truck traffic, lower the noise level,[23] and significantly improve the air quality.

The BZA found that the proposed facility would cause a decrease in truck traffic due to a reduction in solid waste materials having to be transported by truck from the site. The BZA specifically found that

[t]he operation of the existing boilers requires the shipment to the site of fuel oil, coal and limestone and the removal of spent materials by truck resulting in approximately 2,100 truck trips per year.

---

**23.** See Discussion, *supra,* at III B.2. regarding noise level reductions as a result of the proposed facility.

The proposed use of cogeneration technology will result in a reduction of approximately 6,300 tons of solid waste per year generated by the existing coal-fired boiler. The proposed facility is expected to generate approximately 550 truck trips per year, a reduction in overall truck trips of approximately 70%. The reduced number of truck trips will result in overall positive impacts due to a reduction of air pollution and traffic on neighborhood streets generated by existing traffic to the central utility plant.

BZA Finding No. 37.

The BZA concluded that the Cogeneration Facility was unlikely to become objectionable to neighboring property because of noise, traffic, or other unfavorable conditions.

■ Additionally, the BZA found that the implementation of cogeneration technology will result in improved air quality. The BZA found further that due to the closing down of the existing coal-fired burner, "placing the existing natural gas/oil-fired boilers on standby, changing the alternate fuel to a low sulfur fuel oil, and construction of a cogeneration facility using natural gas as its primary fuel," these changes will result in emissions reductions from the existing power plant. BZA Finding No. 34.

Accordingly, the detrimental effects to the area found in *Hilton, supra,* are not present in this proceeding. In fact, the BZA concluded reasonably that the Cogeneration Facility should benefit the neighborhood in some respects by reducing traffic, noise and emissions rather than detrimentally altering the character of it.

We therefore conclude that the BZA's determination that the proposed Cogeneration Facility constituted an accessory use that would be clearly subordinate, incidental and related to the principal use of the University, was based on factual findings which are supported by substantial evidence in the record and are not clearly erroneous nor inconsistent with the Zoning Regulations. We further conclude that the BZA's finding that the proposed facility was on the same lot as the University was

based on substantial evidence. *Citizens I, supra,* 402 A.2d at 41; *Salsbery, supra,* 318 A.2d at 896 (D.C.1974).

### D. Cogeneration and the University Mission

■ The Coalition contends that the proposed Cogeneration Facility fails to align itself with the University mission. The Coalition's argument rests on the proposition that, to meet that mission, the proposed facility must directly and literally tie into the educational pursuit using the facility as an instructional device for electrical engineering students or public utility courses. The BZA noted, however, that the concept of cogeneration technology already has been included in both the approved 1983 and 1990 Campus Plans. Further, the BZA found that

[t]he University's on-campus energy plan has been developed in accordance with its academic mission of not only educating the leaders of tomorrow, but also addressing current problems facing the community including public interest issues such [as] energy, and public health.

BZA Finding No. 10.

Additionally, the BZA found that

[t]he University's research efforts further its academic mission and national and local conservation policies by providing a demonstration laboratory function for projects fielding new technology for conservation of energy and protection of the environment as part of the Congressionally recognized National Exemplar Integrated Community Energy System (NEICES).

*Id.*

The BZA took into consideration that the District of Columbia Office of Energy also supported the project. The Energy Office had also concluded that the proposed facility promotes energy goals and policies on a local level. Further, "[t]he Energy Office was of the opinion that ... the project is consistent with the Public Service Commission's initiative in implementing cogeneration technology; and that it meets the requirements of a qualifying cogeneration fa-

cility under the Public Utility Regulatory Policies Act of 1978." BZA Finding No. 46.

The Coalition contends that the BZA's concept of Georgetown's academic mission would contain no limiting principle. It cites *Marjorie Webster Junior College, supra* note 18, 309 A.2d at 314, for the proposition that a University is not shielded from scrutiny when operating a non-conforming use because the challenged use serves an educational purpose. *Id.* at 318. To be sure, this court has previously noted that the Zoning Regulations do not afford colleges or universities privileged positions. *See id.*

In *Marjorie Webster Junior College,* however, the special exception was denied because of the severely enlarged impact on the residential neighborhood of increased activity on the campus resulting from the very considerable expansion in the school's curriculum and long hours of attendance from morning to night to include "continuing education" courses. *Id.* at 319. In that case, the BZA denied an amendment to the Campus Plan to include continuing education courses because "these new programs have resulted in a substantial increase in the total number of people entering and leaving the neighborhood, usually in automobiles." *Id.*

The decision to deny the special exception in *Marjorie Webster Junior College,* rested on the substantially objectionable conditions in the neighborhood caused by the severely increased traffic to and from the campus from morning to night. *Id.* at 319–20. This court has long supported the proposition that a use must not become objectionable to neighboring property because of noise, traffic, number of students or other unfavorable conditions in a residential zone. *See id.* at 317. *See also Glenbrook Road Ass'n, supra,* 605 A.2d at 30; *First Baptist Church, supra,* 432 A.2d at 698; *Citizens II, supra,* 403 A.2d at 738; *Dietrich, supra* note 18, 320 A.2d at 283; *Stewart, supra,* 305 A.2d at 518.

But, the facts of *Marjorie Webster Junior College, supra,* are inapposite here because the BZA found the proposed facility would effect a reduction in noise, traffic and generally improve the air quality. The BZA conditioned its approval of the proposed facility as being subject to Georgetown making any design changes requested by the Commission of Fine Arts, and provided that the facility complies with air quality regulations set forth by the Environmental Protection Agency and the District of Columbia Department of Consumer and Regulatory Affairs. Accordingly, the BZA did not afford Georgetown an impermissible privilege based on its University status by granting it a special exception to arrange construction of the proposed facility. As noted, BZA approval is specifically conditioned upon acquiescence by the Environmental Protection Agency, the District of Columbia Department of Consumer and Regulatory Affairs and the Commission on Fine Arts.

## IV.

## CONCLUSION

We hold that the BZA's findings are supported by substantial evidence and are not arbitrary or capricious, and that its decision to grant the special exception to Georgetown flows rationally from these findings and is in accordance with the applicable regulations. Consequently, we find no basis to reverse the BZA's decision concluding that the Cogeneration Facility is an accessory use, as defined in the Zoning Regulations. The conclusion is reasonable and in accordance with the law, and therefore no variance is required.

The decision of the BZA is therefore

*Affirmed.*