**Ralph DAVIDSON, Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**Raimonda and Tyrus D. Barre, Intervenors.**

**No. 91–AA–847.**

District of Columbia Court of Appeals.

Argued Oct. 22, 1992.

Decided Dec. 15, 1992.

C. Francis Murphy, with whom Louis P. Robbins and Jonathan L. Farmer, Washington, DC, were on the brief, for petitioner.

Richard B. Nettler, Washington, DC, for intervenors. Cynthia A. Giordano, Washington, DC, was on the brief, for intervenors.*

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

ROGERS, Chief Judge:

Petitioner Ralph Davidson [1] appeals the decision of the Board of Zoning Adjustment that his poolhouse is not an accessory building under the zoning regulations and

---

* Charles L. Reischel, on behalf of the D.C. Board of Zoning Adjustment, filed a statement in lieu of brief, resting on the decision of the Board of Zoning Adjustment and intervenors' defense thereof.

1. Both Ralph and Louise Davidson were intervenors before the Board of Zoning Appeals, but the appeal was taken in Ralph Davidson's name only.

must therefore be modified. He contends that the Board's decision is arbitrary and capricious. We affirm.

## I

In 1990, the Davidsons began major renovations on their property at 4524 Garfield Street, N.W., including replacing an existing poolhouse near their swimming pool with a larger poolhouse. Construction of the new poolhouse began in the summer, without a building permit. In August, after the Davidsons' architect showed the plans for the poolhouse to intervenor Tyrus Barre, who is the Davidsons' neighbor at the adjacent property at 2811 Foxhall Road, N.W., Mr. Barre contacted the Permit Branch of the Department of Consumer and Regulatory Affairs. On August 17, 1990, the Davidsons applied for a building permit by submitting plans and an application to the Permit Processing Division.

The plans described the poolhouse as a two story building. The upper story contained two rooms described as bedroom or office space, and consisted of approximately 350 square feet. The first floor included a living room with a fireplace, a kitchen with a microwave oven, dishwasher, and icemaker, and a "bedroom/office." The entire structure was approximately seventeen feet high (excluding the three feet to the top of the chimney stack). The building was 780 square feet in area and only 1.3 to 1.7 feet from the rear property line, which borders the Barres' property.

The Zoning Division of the Department of Consumer and Regulatory Affairs approved the Davidsons' application on September 4, 1990. The permit was subsequently revised to reflect electrical, mechanical, and plumbing work, and was re-issued on September 11. Mr. Barre again contacted the Consumer and Regulatory Affairs Department, which decided to investigate possible zoning violations and is-

sued a stop work order on September 14. Thereafter, a series of meetings ensued between the Davidsons' architect, Mr. Barre and his attorney, and District government officials. The Davidsons submitted revised plans to the department shortly after a September 28, 1990 meeting. A stop work order was issued on October 10, and further revisions were made to the plans.

The revised plans did not actually change the floor plans but did re-name many of the rooms. The rooms on the upper floor were referred to as "storage" instead of office or bedroom space, and rooms on the first floor were re-designated as the "pool room," the "changing and exercise room," and the "recreation/storage room." Also, the upper area was to be reached by a ladder rather than stairs. The height of the ceilings on the second level was also reduced to six feet five inches, one inch less than the six feet six inch minimum for a story or level. In addition, a retaining wall, approximately two feet high, was added on the side of the poolhouse facing the main house, raising the finished grade; measured from the top of the new grade the height of the pool house is fourteen feet nine and one-half inches, just under the fifteen foot maximum for accessory buildings.[2] The grade "slopes downward" on the side of the poolhouse facing the Barres' property. Because trees have been removed, the poolhouse is easily visible from the Barres' property.

The Zoning Administrator issued a building permit on October 15, but another stop work order was issued, followed by another permit on October 21.[3] After an inspection of the property on October 22 by department officials, including the Zoning Administrator, an electrical work permit was issued on November 10 for electrical outlets, an electric range, heating and air condition-

---

2. *See* 11 DCMR § 2500.7 (1991) ("[t]he height of an accessory building ... shall be measured from the finished grade at the middle of the side of the accessory building that faces the main building to the highest point of the roof of the building").

3. According to Mr. Barre's testimony, revised plans had not been submitted to the department by October 15, and the Zoning Administrator halted construction. The record shows that another permit was issued on October 21, after revised plans had been submitted, but it mistakenly authorized three stories; a corrected permit for one story was issued on November 1.

ing; a revised permit, omitting the range, was issued on November 28.

The Barres appealed the issuance of the building permit to the Board of the Zoning Adjustment on the ground that the poolhouse was "of such a large size ... not customarily incidental to a single-family use as required by the Zoning Regulations." At the hearing before the Board, Mr. Barre testified about his efforts to stop construction of the poolhouse so close to his property line, claiming that to conform with the zoning regulations a poolhouse of that size had to be twenty-five feet from his property line. He described the poolhouse as a complete single family dwelling "in every regard."

The Barres also presented the testimony of Charles B. Soule, an expert architectural witness, who had inspected the poolhouse and the final plans for it. Observing that the poolhouse was "so much larger than any poolhouse structure that I had ever done myself, or ever seen anywhere," Mr. Soule described it as containing 1,275 square feet of floor space, with a second floor with two rooms large enough for bedrooms, and a main room on the ground floor with 894 square feet, including a bedroom, "a changing or exercise room," a kitchen, a closet, and a bathroom. Mr. Soule thought that the space on the first floor "called recreation/storage room ... would make a nice bedroom." There is also a "large stone fireplace which pierces the ceiling" in a "nearly 900 square foot room ... called the pool room." In his opinion, the building was not "in the classification of what should be a poolhouse, or what should be contained in a poolhouse."

Advisory Neighborhood Commission 3D appeared in support of the Barres' appeal. The commission took the position that "the original permit should never have been issued under the guise of an accessory building, [because] the structure was too tall; its size, mass and bulk was not appropriate for the intended use." In its view, the new poolhouse was "intended to be an integral part of the family structure (main dwelling), not incidental to it," and therefore not an accessory building. The commission, like Mr. Soule, saw the upstairs space as "viable second story usage areas," and not merely as storage space.[4]

In addition to letters from neighbors and a three-page petition in support of the appeal, one neighbor appeared at the hearing to support the appeal on the ground that the poolhouse was too large and was not "routine, regular, or customary." The Wesley Heights Historical Society also submitted a statement in support of the appeal. This statement referred to a zoning overlay proposal, meant to preserve the character of the neighborhood, which was pending before the Zoning Commission and had been developed as the result of ongoing study and review of the zoning regulations with professional assistance. During this process, the statement indicated, there had been no indication that "there is any possibility that a structure of the size, type and obvious primary living function of the second house on the Davidson property would be allowed by the present code." The Historical Society was concerned, like the Advisory Neighborhood Commission, that the poolhouse would decrease the Barres' privacy, and the Historical Society was also concerned that the poolhouse would decrease the economic value of Barres' property.

Joseph Bottner, the Zoning Administrator, testified that his original concern about the poolhouse arose from the fact that it was too large and seemed designed for general living activities, rather than the more limited uses expected of an "accessory building." Because only an accessory building could be built closer than twenty-five feet to a rear property line in the Davidsons' R–1 zoning district,[5] he was concerned that "[t]he building appeared to be more than a poolhouse. It identified areas that were indicated as living quarters." Mr. Bottner informed the Davidsons' architect that the plans violated the

---

**4.** Advisory Neighborhood Commission 3D also submitted a letter of December 28, 1990, noting, among other things, that "[t]he current location of the structure results in a gross invasion of the abutting neighbor's privacy and quiet enjoyment of his property."

**5.** See 11 DCMR § 404.1 (1991).

zoning regulations applicable to accessory buildings because they showed a height of over fifteen feet, indicated that rooms would be used for sleeping and other ordinary living activities, and included a possible second story. The Zoning Administrator also informed the Davidsons that the poolhouse could not be used as a sleeping accommodation. He approved the revised plans as conforming with the accessory use requirements, however, for several reasons.

First, a poolhouse is, Mr. Bottner testified, "considered to be incidental and accessory to the pool." Here, there is a poolhouse with recreational and storage facilities, but no sleeping is allowed, and recreational use is a customarily incidental use. Second, the poolhouse occupies under 30 percent of the lot,[6] and is clearly subordinate in size to the main house. The main dwelling is 85 feet wide while the poolhouse is 32 feet wide and only 14 feet nine and one-half inches high (measured from the finished grade at the center of the building).[7] The poolhouse is located in the rear yard of a 31,655 square feet lot with a width of 168.73 feet along Garfield Street; the required lot and width sizes for the R–1–A Zone are 7,500 square feet and 75 feet, respectively.[8] Third, it is a one story building, since the second floor's ceilings are one inch less than the minimum height for a story, and the second level is designed for use as storage.

However, in response to a question whether "there is a judgment issue here that goes beyond the technical aspect of the Zoning Regulations, and that judgment is made based upon, not only room description, but the size of the structure, as well as the intended use," the Zoning Administrator stated, "That is correct." He also conceded that in prior poolhouse plans which he had approved there had not been any clear intent to use the building for a living or bedroom area. He admitted that living quarters are not permitted in accessory buildings except for domestic employees,[9] and that the grade was changed in order to lower the height of the poolhouse. Mr. Bottner acknowledged, moreover, that "[i]f the grade drops toward the neighbor, in this case, to [the] Barre[s], it is only natural that the building would appear to be higher from the back."

The Davidsons presented Walter Lynch, an architect who worked on the poolhouse. He testified about the intended use of the upper level as storage areas with a changing room and a recreational room on the first level. He explained that there was very little difference between the height of the old and new poolhouses, and that after the plans were revised the owner had never indicated an intention to use the poolhouse as anything other than an accessory building. He admitted, however, that only the names of the rooms had been changed in the revised plans, and that there remained operable windows on the second story and air conditioning. He related that after the neighbors had seen the plans they had no trouble with them, and that the Davidsons had offered to shield the poolhouse from the Barres' view with trees.

Mr. Davidson testified that he wanted a poolhouse that would "take full cognizance of the fact that we do have a large family, and it would be a recreation area." Upon being informed the building could not be used for sleeping, he explained that the plans were changed to reflect a different use. He stated that the main use of the poolhouse for recreation would not be contrary to the zoning regulations.

The Board of Zoning Adjustment reversed the Zoning Administrator's decision to issue a building permit, and ordered the Davidsons to alter the design and reduce the scale of the building to bring it within the definition of an "accessory building." In its decision of June 23, 1991, the Board concluded that the poolhouse

> contains some of the kinds of rooms and amenities that are customarily located in a main dwelling.... no adjustments were made to the design and size of the structure to make them consistent with

---

6. See id. § 2500.3 (1991).

7. See id. § 2500.7 (1991).

8. Id. § 401.3 (1991).

9. See id. § 2500.5 (1991).

the more limited use. This structure remains large enough and fully equipped to accommodate activities such as cooking, dining, studying, entertaining, and other activities associated with daily life. Many of these activities exceed what is customary for a poolhouse in the District of Columbia. They are not incidental to uses of the main building and should only occur in a structure that has been set back 25 feet from the rear property line. The Board, therefore, concludes that the poolhouse, as designed, is not an accessory building within the meaning of that term.

Mr. Davidson appeals.

## II

The relevant zoning regulations for an R–1–A Zone District, such as the petitioner's, permit single family dwellings which must be set back twenty-five feet from the rear property line and eight feet from each side property line.[10] The zoning regulations also allow accessory buildings, defined as "subordinate building[s] located on the same lot as the main building, the use of which is incidental to the use of the main building."[11] The accessory buildings allowed in R–1 Zone Districts include garages, private stables, and "[o]ther buildings or structures customarily incidental to the uses permitted in R–1 districts."[12] Such accessory buildings must occupy no more than 30 percent of the rear yard, be no taller than fifteen feet, and have only one story.[13]

■ This court's review of the decision of the Board of Zoning Adjustment is limited to a determination of whether the decision is arbitrary, capricious, or otherwise not in accordance with the law. *Salsbery v. D.C. Bd. of Zoning Adjustment,* 318 A.2d 894, 896 (D.C.1974) (citations omitted).[14] On questions relating to the interpretation of the zoning regulations, such as the Board's interpretation of the "customarily incidental" definition of accessory buildings permitted in R–1 districts, this court's review is more deferential, upholding such interpretations unless they are "plainly erroneous or inconsistent with the [zoning] regulation." *Levy v. D.C. Bd. of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990) (Board's interpretation of specificity required by zoning regulations in campus plan upheld, reversed on other grounds) (citations omitted). *See also Smith v. D.C. Bd. of Zoning Adjustment,* 342 A.2d 356, 360 (D.C.1975) (sun deck; minimum rear yard restriction); *cf. Pauley v. BethEnergy Mines, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991) (courts should defer to an agency's interpretation of its own regulations where the agency decision requires "significant expertise and entails the exercise of judgment grounded in policy concerns"); *Hilton Hotels Corp. v. D.C. Bd. of Zoning Adjustment,* 363 A.2d 670, 671 (D.C.1976) (where conclusion follows as a matter of law from Board's findings, the court must uphold the Board's decision even if the court might have reached a different result were the court considering the case de novo).

Because only an accessory building could be allowed within twenty-five feet of the petitioner's rear property line, the poolhouse must be moved or modified unless it qualifies as an accessory building.[15] The petitioner contends that the Board may not

10. *Id.* §§ 201.1(a), 404.1, 405.9 (1991).

11. *Id.* § 199.9.

12. *Id.* § 204.1 (printed at 39 D.C.Reg. 4204 (1992) (errata)).

13. *Id.* §§ 2500.3, 2500.4 (1991). The only relevant exception allows the upper level of a garage to be used as housing for the domestic employees of the principal building's residents. *See* notes 5 and 8, *supra.*

14. *See also Wheeler v. D.C. Bd. of Zoning Adjustment,* 395 A.2d 85, 89 (D.C.1978) (substantial evidence review); *Myrick v. D.C. Bd. of Zoning*

*Adjustment,* 577 A.2d 757, 759 (D.C.1990) (citation omitted); *Dietrich v. D.C. Bd. of Zoning Adjustment,* 293 A.2d 470, 473 (D.C.1972) (citations omitted).

15. 11 DCMR § 404.1 (1991) provides that a twenty-five foot rear yard is required "for each structure" in an R–1–A zoning district. The Zoning Administrator testified that "there is no restriction on how far an accessory building ... must [be] setback [sic] from the rear property line." *See* note 5, *supra.*

require him to reduce the height or square footage of the poolhouse because those measurements are within the physical maximums for accessory buildings under the Zoning Regulations. Reading the Board's decision to prohibit "cooking, dining, studying, entertaining, and other activities associated with daily life," he maintains that the Board's decision that "the stated activities can only occur in the main dwelling is plainly arbitrary and capricious." He argues that the Board's decision sets up an impossible standard by requiring elimination of any space which could conceivably be used for daily life activities.

█ The District's zoning regulations on accessory buildings include use restrictions in addition to physical restrictions: the use of the accessory building must be "incidental to the use of the main building" and "customarily incidental to the uses permitted in R–1 districts."[16] Thus, the petitioner's contention that he may build a poolhouse as a matter of right, upon compliance with the physical requirements of the zoning regulations, is not the end of the matter. *Cf. Porianda v. Amelkin,* 115 A.D.2d 650, 496 N.Y.S.2d 487, 488 (1985) (although "boating may be a popular hobby in [the] ... neighborhood," an "unusually large structure in which to store and service [a] boat" is not an accessory use in the absence of "proof that the type of structure proposed would be 'customarily found in connection with' the type of one-family residence to be built on the subject plot so as to qualify it as an 'accessory building' "). While a property owner has the right to use his or her property in conformance with the physical restrictions in the zoning regulations, the nature or scale of a permissible use in an accessory building is not unlimited. *See generally* Robert Roy, Annotation, *Zoning: What Constitutes "Incidental" or "Accessory" Use of Property Zoned, and Primarily Used, For Residential Purposes,* 54 A.L.R.4th 1034 (1987). *Cf. Sheridan–Kalorama Neighborhood Council v. D.C. Bd. of Zoning Adjust-*

*ment,* 411 A.2d 959, 961 (D.C.1979) (restrictions on what uses may follow an existing non-conforming use); *Dolan v. DeCapua,* 13 N.J.Super. 500, 80 A.2d 655, 658 (1951) (where there is pre-existing nonconforming use of property, property owner may be "within his [or her] rights in *continuing* such use ... *but he [or she] may not enlarge the use* " even though "new use would be 'no more harmful' than the old to the adjacent landowners") (citation omitted).

█ We do not read the Board's decision, as does the petitioner, to prohibit all of the stated activities in a poolhouse.[17] Rather, we understand the Board to view the accessory building regulations as including a scale requirement with regard to permissible uses. The plain language of the District's regulations, by referring not only to a "subordinate" building but to "customarily incidental" uses, makes clear that a building is not an accessory building where given its size, design and declared purposes, it can reasonably be expected to duplicate the functions of the main building rather than in fact serving as incidental to those uses. *See Maynard v. Tomyl,* 347 Mass. 397, 198 N.E.2d 291, 292–93 (1964) (second house is not accessory use even though smaller than main residence, where it is "a dwelling with adequate facilities for occupancy apart from any other structure") (footnote omitted); *Yunker v. Means,* 271 Or. 56, 530 P.2d 846, 847 (1975) (deck used for sitting, eating, sleeping and other usual deck uses is not a detached accessory structure for set-back purposes, observing that "[a]n accessory building is a subordinate building incidental to the use of the main building. If it is an integral part of the main building, it cannot be accessory"); *Carney v. City of Baltimore,* 201 Md. 130, 93 A.2d 74, 76 (1952) (addition to main building not accessory use). *See also Borough of Chatham v. Donaldson,* 69 N.J.Super. 277, 174 A.2d 213, 216 (1961) ("accessory use has been defined as one

16. *Id.* §§ 199.9 (1991), 204.1 (printed at 39 D.C.Reg. 4204 (1992) (errata)).

17. The Board did not rule that recreational activities were impermissible at a poolhouse. Nor

did it suggest that other activities, such as all eating, reading and the like, were not permitted. Consequently, the petitioner's reliance on *Thomas v. Zoning Board of Adjustment,* 241 S.W.2d 955, 958–59 (Texas Civ.App.1951), is misplaced.

customarily incident to the principal use and so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it") (citations omitted); *see generally County Comm'rs of Carroll County v. Zent,* 86 Md.App. 745, 587 A.2d 1205 (1991) (reviewing definitions of accessory use adopted in different jurisdictions).

Accordingly, in determining whether or not uses are "customarily incidental," the Board could properly look at photographs of the building and the building plans in order to determine what would be the normal uses of the building. The term "customarily incidental" incorporates an objective, not subjective, standard. The Board determined that a building of the size of the petitioner's poolhouse is destined for a normal use which exceeds normal poolhouse use. In fact, the poolhouse is not similar in scale to the prior poolhouse on the property, but is approximately twice as long and three times as wide as the old poolhouse, and it includes a variety of rooms and facilities permitting independent daily living activities.[18] In the Board's words: "[t]he subject structure is very large and contains some of the kinds of rooms and amenities that are customarily located in a main dwelling." Thus, the Board's decision does not focus on the size of the poolhouse alone, but on an objective evaluation of its size *in conjunction with* the design and contents of the structure in concluding that the poolhouse would not be used only for the "customarily incidental" purposes allowed for accessory buildings in an R–1 district.

In our opinion, the petitioner has failed to demonstrate that this is an unreasonable interpretation of the accessory building regulations. The interpretation does not involve, as the petitioner suggests, a determination of whether the petitioner would use the building in a manner contrary to the representations in his plans. Rather, it involves a determination of what a property owner would normally do with a building of this size and configuration. That determination is required in order for the Board

to determine whether the poolhouse complies with the "customarily incidental" use restriction in the zoning regulations for accessory buildings. A requirement that the Board rely only on the owner's representations would clearly be inconsistent with the Board's responsibility for interpreting the zoning regulations.

The petitioner also contends that larger poolhouses have been approved at least once before. We need not decide whether or not this is sufficient proof that a use is "customarily incidental" to the permitted uses. *See* 54 A.L.R.4th, *supra,* at 1048 (citing *Salem v. Durrett,* 125 N.H. 29, 480 A.2d 9, 11 (1984) ("one instance in another town does not rise to the level of custom")); *cf. Porianda v. Amelkin, supra,* 496 N.Y.S.2d at 488 (no proof of any similar structure). In the example on which the petitioner relies, the landowner obtained a height variance to build a poolhouse that exceeded the usual size limitations for accessory buildings. *See* Application No. 14385, of John D. Rockefeller IV, January 22, 1986. Similarly, the petitioner's reliance is misplaced on Appeal No. 12276 of Eva Robertson Hinton, February 8, 1977, where the Board upheld the issuance of a building permit for an accessory building that was being used as sleeping quarters. In that case there was no issue raised about the size or nature of the building itself but only with regard to the use that was being made of the innocuous structure; the Board determined that issue was more properly addressed under the housing code. By contrast, there was substantial evidence here to support the Board's finding that the physical size and design of the petitioner's poolhouse indicate that the building is meant for more than accessory, "customarily incidental" use in an R–1 district.

Accordingly, we hold that the Board's decision was not arbitrary or capricious or inconsistent with the zoning regulations. The Board's interpretation of the accessory building regulations to restrict the scale of activities that may be conducted in the

---

18. A letter (with photographs) from the prior owner of the Davidsons' property indicates that the prior poolhouse had consisted of two dressing rooms, a storage area for some pool equipment, and a wet bar.

petitioner's poolhouse is not plainly erroneous. Not only does the large size of the building resemble that of a single family dwelling, but the record before the Board shows that the configuration of rooms and the equipment are consistent with a single family home and, thus, supports the Board's conclusion that the petitioner's poolhouse is not a "customarily incidental" accessory building in an R–1 district. *See generally New Jersey v. P.T. & L. Construction Co., Inc.*, 77 N.J. 20, 389 A.2d 448, 451 (1978) ("customary" means "so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it," and "incidental" is defined as "bear[ing] a close resemblance and obvious relation to the main use to which the premises are put") (citations omitted). The Zoning Administrator emphasized in his testimony the comparative sizes of the main house and the poolhouse in view of the size of the petitioner's lot, but he also agreed that under the accessory building regulations judgment was to be exercised beyond the technical aspect of the regulations. It is precisely that judgment to which the court must defer. We, therefore, affirm the June 23, 1991, decision of the Board.