## GEORGETOWN RESIDENTS ALLIANCE, et al., Petitioner,

v.

## DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.

### No. 00–AA–125.

District of Columbia Court of Appeals.

Argued Dec. 13, 2001.
Decided July 11, 2002.

---

Don W. Crockett, with whom Ronald R. Snider, Washington, DC, was on the brief, for petitioner.

Carl J. Schifferle, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on brief, for respondent.

Before WAGNER, Chief Judge, and FARRELL and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

On October 6, 1999, the Board of Zoning Adjustment (BZA) granted the application of the Tudor Place Foundation, Inc., (Foundation), a nonprofit organization, to (1) continue for an additional period of three years the previously approved operation of a house museum located at 1644 31st Street, N.W. (also known as the Tudor Place); and (2) extend the originally approved operation of the house museum to include the adjacent property located at 1670 31st Street, N.W. (also known as the Dower House). The Foundation's intent at the time was to use the Dower House for meetings, small receptions, and art programs.

The BZA found that the Foundation, after extensive communications with the neighboring community, had devised a highly restrictive list of conditions for the operation of the house museum and its special events [1] that would help to alleviate any adverse affects on the neighboring properties. The applicant's willingness to agree to these conditions resulted in the unanimous support of the Advisory Neighborhood Commission 2E (ANC 2E) and a large number of the neighborhood residents. The application was opposed, however, by several neighborhood residents, including petitioner, Georgetown Residents Alliance (GRA). Their petition for review principally challenges the propriety of the BZA's ruling to extend Tudor Place's use as a house museum, when the museum is also being used to host special events and corporate gatherings, as well as the authority of the BZA to allow the originally approved operation to include the adjacent Dower House. Finding substantial evidence to support the BZA's rulings, we affirm.

## BACKGROUND

Designated a National Historic Landmark and listed in the District of Columbia Inventory of Historic Sites, Tudor Place is among the foremost Federal era mansions in the nation. Thomas Peter and his wife

---

1. As a source of revenue, the Foundation hosts fund-raising events and occasionally rents its grounds for private functions.

Martha Custis Peter purchased the original Tudor Place estate in 1805. Martha Custis Peter was the granddaughter of Martha Washington, and an inheritance from George Washington financed the purchase of the estate. The neoclassical mansion was designed by Dr. William Thornton, the first architect of the United States Capitol, and was built in 1816. Through the years, six generations of the Peter family have lived in Tudor Place. The buildings, gardens, collections, and archives reflect a family continuity of 180 years unique in the nation's capital.

In 1966, Armistead Peter III, then owner of Tudor Place, granted a scenic easement to the United States Department of the Interior for the permanent preservation of Tudor Place and its grounds by preventing the land from being subdivided or inappropriately developed. As one of the last direct descendants of the Peter family, Mr. Peter also executed a will to maintain Tudor Place for the public's use and enjoyment in perpetuity. On the death of Armistead Peter III in 1983, Tudor Place Foundation, Inc., assumed management of the property. The house and grounds were opened to the public in 1988.

Since 1988, the Board of Zoning Adjustment has approved the use of Tudor Place as a house museum for limited year terms, pursuant to 11 DCMR § 201.1 (1995).[2] As a house museum, Tudor Place is open for public tours of the house and its garden. In addition, Tudor Place hosts events for charitable groups at no charge and provides free tours and educational programs for school groups.

The Dower House property was a part of the original Tudor Place estate, but the Peters sold that portion of the estate around the time of the Civil War. The Dower House was built in 1867. In 1961, Armistead Peter III repurchased the property for use once again as an integral part of the family residence. Upon Mr. Peter's death, his widow received a life tenancy in the Dower House, with the remainder passing to the Foundation. Since Mrs. Peter's death in 1995, the Dower House has been used as housing for the Executive Director of Tudor Place and a Tudor Place intern, as well as, a place for the Foundation's Board of Trustees meetings.

## ANALYSIS

### 1. Tudor Place

 In the present case, the BZA concluded that the Foundation's application, seeking a special exception to continue the operation of a house museum in an R–1 residential district, was governed by 11 DCMR §§ 3108.1 and 217[3] (1995), of the zoning regulations. Pursuant to section 3108.1, the BZA is authorized to grant

---

2. 11 DCMR § 201.1 provides:
 Nonprofit Organizations (R–1)
 The use of existing residential buildings and the land on which they are located by a nonprofit organization for the purposes of the nonprofit organization shall be permitted in an R–1 district in the following instances if approved by the Board of Zoning Adjustment in accordance with the conditions specified in § 3108 of chapter 31 of this title, subject to the provisions of this section:
 (a) If the building is listed in the District's Inventory of Historic Sites contained in the comprehensive statewide historic survey and plan prepared pursuant to § 101(a) of Public Law 89–665, Oct. 15, 1966 (16 U.S.C. §§ 470a–470m), or if the building is located within a district, site, area, or place listed on the District's Inventory of Historic Sites; and
 (b) If the gross floor area of the building in question, not including other buildings on the lot, is ten thousand square feet or greater.

3. Section 217 provides standards by which the application for a special exception must be judged.

special exceptions where, in the judgment of the board, "those special exceptions will be in harmony with the general purpose and intent of the zoning regulations and will not tend to affect adversely the use of neighboring property." *Id.* The BZA granted the special exception, concluding that the Foundation met the requirements under both sections of the zoning regulations.[4]

▮ Our review of a decision of the BZA is limited to a determination of whether the decision is "arbitrary, capricious, or otherwise [not] in accordance with the law." *Davidson v. District of Columbia Bd. of Zoning Adjustment,* 617 A.2d 977, 981 (D.C.1992) (internal citations omitted). On questions relating to the interpretation of the zoning regulations, this court's review is deferential, "upholding such interpretations unless they are plainly erroneous or inconsistent with the zoning regulation[s]." *Id.* Accordingly, this court must uphold the decision of the BZA "if [it] rationally flow[s] from findings of fact supported by substantial evidence in the record as a whole." *National Cathedral Neighborhood Ass'n, supra* note 4, 753 A.2d at 986 n. 2.

GRA disputes whether the application satisfied the requirements under section 217. GRA first argues that the BZA exceeded its authority by ignoring the fundamental requirement of section 217.2, that any use by a nonprofit organization "shall not adversely affect the use of the neighboring properties." 11 DCMR § 217.2. GRA asserts that the special events hosted at Tudor Place create "intolerable noise" for many nearby residents adversely af-

fecting the use of neighboring properties. Petitioner contends that the BZA granted the special exception in disregard of the express requirements of section 217.2 and, therefore, the decision should be reversed.

▮ The BZA's function is to determine whether a reasonable accommodation has been made between the applicant and the neighbors, which does not interfere with the "legitimate interests" of the latter. *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 32 (D.C.1992). The regulation requires only that the applicant demonstrate that it is not likely that the proposed site will become objectionable to neighboring properties. *Id.*

▮ With respect to section 217.2, the BZA found that the special events hosted at Tudor Place would not adversely affect the use of neighboring properties. The BZA's decision was based in large part on the steps the Foundation had taken to address the concerns of the neighboring properties. The BZA found that the Foundation's agreement to prohibit the use of amplified music during functions; to not engage in any heavy cleanup during evening hours; and to adhere to a curfew of 10:30 p.m. for hosted events, were reasonable accommodations that would appropriately address community concerns regarding noise from events hosted at Tudor Place. Because the BZA's decision is supported by substantial evidence in the record, and is neither arbitrary, capricious, or otherwise not in accordance with law, we find no reason to disturb that determina-

4. In evaluating requests for special exceptions, the BZA is limited to a determination of whether the applicant meets the requirements of the exception sought. "The applicant has the burden of showing that the proposal complies with the regulation; but once that showing has been made, the Board ordinarily must

grant the application." *National Cathedral Neighborhood Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 753 A.2d 984, 986 n. 1 (D.C.2000) (quoting *French v. District of Columbia Bd. of Zoning Adjustment,* 658 A.2d 1023, 1032–33 (D.C.1995)).

tion. *See Davidson, supra,* 617 A.2d at 981.

■ The GRA next contends that the Foundation cannot satisfy its requirements under 11 DCMR § 217.3, "that the amount and arrangement of parking spaces ... [be] adequate and located to minimize traffic impact on the adjacent neighborhood." GRA argues that the BZA's finding that there would be no adverse impacts on traffic and parking is not supported by substantial evidence. Specifically, the GRA asserts that the evidence presented at the application hearing clearly demonstrated that "the amount and arrangement of parking spaces [is] wholly inadequate and that traffic and parking impacts on the neighborhood cannot be minimized." As a result, GRA contends that the foundation clearly failed to carry its burden of proving that the amount and arrangement of parking spaces would be adequate and, therefore, the decision of the BZA should be reversed.

From the record, it appears that parking and traffic complaints from neighboring residents during large special events was the most hotly contested issue associated with the continuation of the special exception for the Tudor Place. The BZA found that the Foundation had made a "terrific effort" to control traffic and parking by implementing a plan to "strengthen its control over traffic problems." These plans required the Foundation to, among other things, to hire a minimum of one person to direct traffic; park visitors' cars at off-site parking lots through the use of valet parking; police the area to ensure that vehicles are not double-parked and do not block any entrances or driveways; instruct the drivers of all buses and vans not to idle the engines of their vehicles longer than is necessary to allow passengers to embark or disembark; and maximize the use of the rear entrance to the site on 32nd Street, especially for service functions. Based upon these measures, the BZA concluded that the special events would "not have significant adverse impacts" on traffic and parking in the neighboring community.

We find substantial evidence in the record to support the BZA's conclusion. *See National Cathedral Neighborhood Ass'n, supra,* note 4 at 986. In speculating that these measures cannot eliminate all potential parking concerns, GRA fails to view Tudor Place's effect on parking in its proper overall context. As the BZA found, Tudor Place "generates little demand for parking on the surrounding streets the majority of the time." In fact, due to its low-density use and extensive street frontage, Tudor Place, far from adversely impacting residential parking needs, more often generates parking space for the community along its three perimeter streets. No showing has been made that, on those limited occasions where the Foundation holds special events, the parking concerns are not addressed by the measures stated in the Foundation's plan. Consequently, the BZA reasonably concluded based on substantial evidence that the Foundation's special events would not adversely impact traffic or parking in the neighboring community.

Moreover, as further reason for its decision to grant the exception, the BZA explained that the Foundation contributes to the surrounding community in many ways by providing tours of the house and gardens; hosting events for charitable groups at no charge; and providing free tours and educational programs for school groups. The BZA commented that the extensive and historically protected open space of the property is an important amenity to the community. On its five-and-one-half acres there are many handsome trees edging the gardens, creating a park like set-

ting for nearby residents. The BZA reasoned that the benefits gained from the continued operation of Tudor Place coupled with the reasonable accommodations made by the Foundation to alleviate adverse effects on neighboring properties provided sufficient evidence to conclude that the special events hosted at Tudor Place would not adversely effect neighboring properties. We are satisfied that the BZA carefully considered petitioner's concerns when it approved Tudor Place's application.

Petitioner also claims that the restrictions enunciated in 11 DCMR § 217.4, explicitly restrict the Foundation from hosting special events because the events are "commercial" in nature. GRA contends that the restrictions in section 217.4 cannot be interpreted to permit nonprofits "to rent the[ir] buildings and grounds on a commercial basis to others for profit." [5]

■ The BZA determined that the Foundation did not "create, exchange, or sell any good, chattel, wares, or merchandise" on the premises, which would violate the provisions of section 217.4. The BZA explained that the only activity that could be complained of as "commercial" occurred in the small museum shop at Tudor Place, which is engaged in the sale of items related to the house museum. The BZA concluded that these sales are expressly permitted under section 217.4 as items "related to the purpose of the nonprofit organization." *Id.* at § 217.4.

The BZA also addressed the applicability of section 217.4 to the special events hosted at Tudor Place. The BZA, in interpreting its rule, concluded that the limited number of special events hosted at Tudor Place are not "commercial" in nature and do not result in "commercial" use of the site. The BZA opined that the special events are accessory to the primary museum use and, based on the evidence, are essential to the continued financial viability of this historic site. The BZA further explained that the use of house museums as venues for special events is a common practice in the District of Columbia and, accordingly, is customarily incidental to the principal museum use.

■ We will uphold the BZA's interpretation of its regulation so long as it is not plainly erroneous or inconsistent with the zoning regulations. *Davidson, supra,* 617 A.2d at 981. The plain language of the statute, as interpreted by the BZA, only applies to the "commercial" creation or sale of goods, chattel, wares, or merchandise. The BZA found that the limited number of special events at Tudor Place do not amount to "commercial" activity within the meaning of section 217.4. Because the BZA's interpretation fits squarely within the language of section 217.4 and is not inconsistent with the zoning regulations, we see no reason to second-guess the BZA's interpretation of its own regulation. *See id.* (explaining that we should defer to an agency's reasonable interpretation of its own regulations).

For these reasons, the BZA's grant of a special exception for the Foundation's nonprofit use of Tudor Place as a house museum was based on substantial evidence and was in accordance with the zoning regulations.[6]

---

5. 11 DCMR § 217.4 provides that:

No goods, chattel, wares, or merchandise shall be commercially created, exchanged, or sold in the residential buildings or on the land by a nonprofit organization, except for the sale of publications, materials, or other

items related to the purposes of the nonprofit organization.

6. Petitioner also argues that 11 DCMR §§ 200, 201 (1995) contain additional standards by which the instant application must be judged. The BZA, however, concluded that

## 2. The Dower House

 GRA argues that the BZA exceeded its authority by including the Dower House within the special exception granted to the Foundation. Specifically, petitioner asserts that the grant by the BZA, giving the Foundation the right to use the Dower House as an accessory to the house museum, is beyond the statutory power of the BZA because an accessory use must be on the same "lot of record" as the principal lot. GRA contends that because Dower House is not on the same "lot of record" as Tudor Place, the BZA lacked the authority to extend the special exception to the Dower House. In addition, GRA argues that the BZA incorrectly interpreted the term "lot" to include adjacent properties that are taxed as one lot.

To extend the special exception to include the Dower House, the BZA relied on language in the zoning regulations contained in 11 DCMR § 217.1(b) (1995), which clearly contemplates that a site may contain more than one building. Section 217.1(b) states that "the building in question, not including other buildings on the 'lot,'" must be "10,000 square feet or greater." Moreover, the BZA explained, a "lot" and "lot of record" are not equivalent terms. Under the zoning regulations, "lot" is defined as:

> The land bounded by definite lines that, when occupied or to be occupied by a building or structure and accessory buildings, includes the open spaces required under this title. A lot may or may not be the land so recorded on the records of the Surveyor of the District of Columbia.

*Id.* at § 199.1 (1995) (emphasis added). By contrast, a "lot of record" is "a lot recorded on the records of the Surveyor of

the District of Columbia." *Id.* Since a "lot" by definition may or may not be a "lot of record," the BZA concluded that the Dower House simply needed to be located on the same "lot" as Tudor Place in order to be part of the special exception approval—it did not have to be on the same "lot of record."

 The BZA's interpretation of the applicable section is consistent with the zoning regulations. *See Glenbrook Rd. Ass'n, supra*, 605 A.2d at 30. This court has recognized the distinction between the terms "lot" and "lot of record": while a "lot is a general term used to describe any plot of land, [a] lot of record is a lot platted and recorded by the District of Columbia Surveyor." *Sagalyn v. Foundation for the Pres. of Historic Georgetown*, 691 A.2d 107, 112 n. 7 (D.C.1997). Thus, while Dower House, an adjacent property, must be located on the same "lot" as the principal property, it need not be located on the same "lot of record." The BZA did not exceed its authority by extending the special exception to the adjacent Dower House.

Contrary to petitioner's arguments, the BZA's consideration of this matter reflects a reasoned and thorough review of the relevant legal and factual issues. Accordingly, the decision of the BZA is

*Affirmed.*

---

sections 200 and 201 are merely precatory and do not contain the standards by which the Foundation's application should be judged. Having reviewed the sections, we are in agreement with the BZA's interpretation. Accordingly, we reject GRA's argument.