**GEORGETOWN RESIDENTS ALLIANCE, Petitioner**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent**

**Georgetown University, Intervenor.**

No. 98–AA–1819.

District of Columbia Court of Appeals.

Argued Dec. 6, 2000.
Decided Feb. 6, 2003.

Don W. Crockett, for petitioner.

Maureen E. Dwyer, with whom Paul J. Kiernan, Washington, DC, was on the brief, for intervenor.

Robert R. Rigsby, Corporation Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before TERRY, RUIZ, and REID, Associate Judges.

TERRY, Associate Judge:

Petitioner, the Georgetown Residents Alliance ("GRA"), seeks review of an order of the Board of Zoning Adjustment ("BZA") which upheld a decision of the Department of Consumer and Regulatory Affairs ("DCRA") to allow Georgetown University to convert one of its buildings

1. Recodified as D.C.Code § 2–509(e) (2001).

2. R–3 districts are residential districts "designed essentially for row dwellings." *See* 11 DCMR §§ 105.1(a)(3), 320.1 (1995).

into a child development center. The GRA offers four arguments for reversal. First, it contends that the BZA wrongly interpreted the zoning regulations when it ruled that building permits for the center could issue without a special exception from the BZA; second, it argues that the BZA finding that the GRA did not timely appeal from the issuance of two permits was not supported by substantial evidence; third, it maintains that the BZA was required to give "great weight" to the recommendations of certain Advisory Neighborhood Commissions and failed to do so; and fourth, it claims that the BZA order was defective because it lacked actual findings of fact, in violation of D.C.Code § 1–1509(e) (1999).[1] We reject all of these arguments and affirm the BZA decision.

I

Georgetown University sought to convert one of its buildings, Poulton Hall, into a child development center for approximately sixty children of the University's faculty, staff, and students. The proposed location of the center was on lot 835, at the corner of 37th and P Streets, N.W., and two adjacent vacant lots, 161 and 162. The proposal did not require any physical expansion of Poulton Hall or construction of any new buildings, but it did call for renovations to the building on lot 835 and for the installation of play equipment, a shed, and a fence on lots 161 and 162.

All three lots are in an R–3 zoning district[2] and are within the campus boundaries outlined in the BZA-approved 1990 Campus Plan for the University.[3] Under

3. On October 12, 1990, the BZA unanimously approved Georgetown's Bicentennial Campus Plan in BZA Order No. 15302.

After the instant petition for review was filed, the BZA voted to approve Georgetown University's Campus Plan 2000 after public notice and special exception hearings as re-

the 1990 Campus Plan, Poulton Hall was approved for use as "mixed use main campus education/educational support." In the past, Poulton Hall had been used for classrooms, offices, a post office, a theater, and, most recently, a printing shop.

In 1995 University representatives met with the DCRA's Acting Zoning Administrator to discuss the proposed child development center. The Acting Zoning Administrator agreed with the University's position that the use of Poulton Hall as a child development center would be an "accessory use" to that already approved under the 1990 Campus Plan and, as such, would not require BZA review or approval.

On May 7, 1996, Georgetown University representatives attended a meeting of Advisory Neighborhood Commission ("ANC") 2–E, which represents the contested area, and asked for the ANC's approval of the plans for the center without further proceedings before the BZA. The ANC, however, believed that the BZA had to grant a special exception before the plans could go forward, and voted unanimously to "inquire into (and protest) the omission of the zoning variance [*sic*]."

On June 26, 1996, relying on the Acting Zoning Administrator's conclusion that no BZA approval was required, the University applied to the DCRA for building permits to renovate Poulton Hall and for separate permits to erect the fence, shed, and play equipment. On August 19 a representative of the GRA attended a meeting with DCRA Director Hampton Cross to discuss certain defects in the permit applications and the lack of a special exception proceeding before the BZA. Mr. Cross

made two rulings at that meeting: that the procedural flaws in the permit applications had to be corrected, and that the DCRA would not issue permits until the Corporation Counsel had reviewed the matter. The University continued to submit permit applications to the DCRA after this meeting, although the GRA understood that no permits would be issued until the Corporation Counsel had been consulted. Eventually, on August 28, the DCRA issued the final permits for construction of a fence, a shed, and play equipment on lots 161 and 162.

On December 27, 1996, Mr. Cross responded to a letter that ANC 2–E Commissioner Byrd had written to the Corporation Counsel. Mr. Cross stated that "after consulting with Corporation Counsel [and] the Acting Zoning Administrator and reviewing the concerns of all parties involved, the [DCRA] has made the decision to issue alteration and repair permits for the proposed Child Development Center."

On January 31, 1997, the DCRA issued the final permits for renovation of Poulton Hall.

The GRA appealed to the BZA, challenging the issuance of all the permits. The BZA held a hearing on the matter, receiving testimony from, among others, representatives of the GRA and ANC 2–E. The BZA also heard extensive testimony from the Acting Zoning Administrator explaining the reasons for her decision. In its final written order, the BZA ruled that the use of Poulton Hall as a child development center was consistent with the previously approved 1990 Campus Plan and

---

quired by the zoning regulations. *See* 11 DCMR § 210. The Campus Plan 2000 includes the designation of Poulton Hall as a child development center and makes specific reference to a child development center as one of the permitted accessory uses under the

University's "academic/administrative" use category. The GRA fully participated as a party in the hearings on the new Campus Plan, but raised no objection there to the use of Poulton Hall as a child development center.

that "[s]ince the proposed use is intended to serve students, faculty, and staff of the University, as well as to support the teaching mission of the University, it is a proper University function and does not come within the normal zoning restrictions for a child development center in an R–3 District." The BZA also noted in its order that it and prior Zoning Administrators had approved child development centers on other university campuses in the District of Columbia without granting special exceptions.[4]

In addition, the BZA determined that, with respect to the permits for lots 161 and 162, the appeal was not timely. The order went on to say that the uses on those lots were accessory uses, allowed as a matter of right on residentially zoned land, and that BZA approval was not required in any event.

The BZA concluded that the child development center did not require a special exception under 11 DCMR § 205[5] because it was a permissible accessory use consistent with the approved campus plan governing the site. "As such, it is permitted under the land use category of education/educational support."[6]

## II

■ This court must uphold the validity of the BZA's findings if they are "supported by and in accordance with ... reli-

able, probative, and substantial evidence." D.C.Code § 1–1509(e) (1999);[7] see Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n, 402 A.2d 36, 41 (D.C.1979). Beyond that, our review of a BZA decision is "limited to a determination of whether the decision is arbitrary, capricious, or otherwise not in accordance with the law." Davidson v. District of Columbia Board of Zoning Adjustment, 617 A.2d 977, 981 (D.C.1992) (citation omitted). In addition, we defer to the BZA's interpretation of the zoning regulations and must uphold that interpretation "unless it is plainly erroneous or inconsistent with the regulations." Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment, 605 A.2d 22, 30 (D.C. 1992) (citation omitted). Guided by these principles, we reject the GRA's contentions.

## A. Was a special exception required?

■ The GRA's main argument is that the plain and unambiguous language of the zoning regulations, specifically 11 DCMR § 205, has only one meaning: that a special exception is a prerequisite for all child development centers in all residential zones, and that the BZA therefore erred when it ruled that the permits could issue without a special exception because the child development center at issue was already a permissible accessory use.[8] We

---

4. The BZA listed Catholic University, Howard University, American University, and Trinity College as schools for which child development centers had been approved as a matter of right. Also in the record is a copy of BZA Order No. 14082, issued February 1, 1984, which approved Catholic University's use of a portion of one of its buildings as a child care center as a matter of right.

5. Section 205 authorizes the BZA to grant a special exception for a child development center if certain specified conditions are met.

6. No stay of the BZA order was ever sought or granted. After the BZA ruled, work proceeded to completion on the child development center. According to the GRA's brief, the center has been in operation since 1998.

7. Recodified as D.C.Code § 2–509(e) (2001).

8. The GRA sought a special exception because of what it regards as the procedural safeguards that accompany such a proceeding. If a special exception were required, residents of the area adjacent to the proposed child development center would be afforded notice

hold, to the contrary, that the BZA's conclusion was correct as a matter of law and fully consistent with the zoning regulations.

11 DCMR § 205.1 provides that child development centers "shall be permitted in an [R–3][9] district if approved by the [BZA] in accordance with the conditions specified in § 3108 of chapter 31 of this title, subject to the provisions of this section." Section 3108, in turn, states that the BZA may grant special exceptions for, among other things, child development centers in residentially zoned districts. Although section 205, when read in isolation, seems to require a special exception for all child development centers, the BZA ruled, in essence, that because the 1990 Campus Plan had already been approved by the grant of a special exception under section 210,[10] and because the child development center was a use consistent with the uses approved in that plan, a second special exception under section 205.1 was not required.

■ Reading the zoning regulations as a whole,[11] we agree with the general proposition advanced by the BZA and the University: that if a specific land use has already been approved by the grant of a special exception under section 210, and no change in that use or construction of additional buildings is proposed, then a second special exception under section 205 for the already approved use is not required. *See Levy v. District of Columbia Board of Zoning Adjustment,* 570 A.2d 739, 748–749 (D.C.1990). We agree with the University that requiring a second special exception in such a case, granted after its own separate hearing, would render the first special exception meaningless.[12] The real issue in this case is whether the proposed child development center was in fact a use consistent with the uses permitted under the 1990 Campus Plan, so that it can correctly be said that such a use was effectively approved in 1990.

Under the 1990 Campus Plan, Poulton Hall was approved for use as "mixed use

of the proposed use and an opportunity to be heard at a public hearing before the BZA. *See* 11 DCMR §§ 3300–3399; *see generally Rhema Christian Center v. District of Columbia Board of Zoning Adjustment,* 515 A.2d 189, 192 (D.C. 1986). The GRA does not assert that the center itself has caused it any injury; indeed, the center has been fully operational for more than four years, and the GRA has not objected to its continued use. Rather, it contends that, had a special exception been required in this case, it would have been able to offer to the BZA, at a hearing, any objections it might have had before the permits were issued. It is the unavailability of a hearing at which such objections could be presented that underlies the GRA's claims of error. Although there was a hearing before the BZA, it was limited to the issue of whether a special exception was required, not whether one should be granted.

9.  Section 205.1, which applies in R–1 districts, is incorporated by reference into the regulations for R–3 districts. *See* 11 DCMR §§ 300.3(a) and 320.3(a).

10.  Section 210 provides, *inter alia,* that a use as a college or university is permitted in a residential district after a special exception is granted by the BZA following a hearing. We note that the University's Campus Plan 2000—approved after a hearing in which the GRA participated—designates Poulton Hall as a child development center.

11.  *See Lange v. District of Columbia Board of Zoning Adjustment,* 407 A.2d 1058, 1061 (D.C. 1979).

12.  We emphasize, however, that a second special exception may be required for concepts that have been approved in a campus plan if new construction is to occur, if there is a change in use from that approved in the campus plan, or if the approval of a particular use in the campus plan was contingent upon obtaining further BZA approval. *See Citizens Coalition v. District of Columbia Board of Zoning Adjustment,* 619 A.2d 940, 943–944 (D.C.1993); *Levy,* 570 A.2d at 749.

main campus education/educational support." The BZA ruled in this case that "accessory" uses were permitted under that designation and that the child development center was such an accessory use. There are two separate questions here which we must address: first, was the use as a child development center an accessory use within the meaning of the zoning regulations, and second, is such an accessory use permissible under a campus plan designation of "mixed use main campus education/educational support" without additional BZA approval? We answer both questions in the affirmative.

The zoning regulations define an accessory use as "a use customarily incidental and subordinate to the principal use, and located on the same lot with the principal use." 11 DCMR § 199. Section 321.1(b) of the regulations further defines an accessory use in an R–3 zone as a use "incidental to" permitted uses. The Acting Zoning Administrator and the BZA both concluded that the child development center was an accessory use to the University. At the hearing before the BZA, the Administrator testified that the center was such an accessory use because it "serve[d] . . . the University population" and supported the University's educational mission. In its order the BZA held that, because the child development center would be used exclusively by University faculty, staff, and students and would "support the teaching mission of the University," it was an accessory use. The BZA also pointed out that child development centers on other university campuses in the District have been approved as a matter of right without additional BZA approval. *See* note 4, *supra.*

We have generally afforded the BZA fairly wide latitude in construing the term "accessory use," so long as its interpretation is rational and not inconsistent with the zoning regulations.[13] In *Citizens Coalition v. District of Columbia Board of Zoning Adjustment,* 619 A.2d 940 (D.C. 1993), we upheld the BZA's conclusion that an addition to a power plant located on the Georgetown campus was an accessory use to the University.[14] We endorsed as reasonable the BZA's interpretation of the phrase "accessory use" to include the power plant because it was "clearly subordinate, incidental and related to the principal use of the University," *id.* at 956, and found the BZA's rationale convincing:

> Like food sold in a cafeteria to students, the energy generated by the facility, used to heat dormitories, classrooms, a hospital, and other campus buildings, would also be for the benefit of the students, and thus serve as an accessory use to the principal function of the University.

*Id.* at 951.

Applying the same reasoning, we conclude that the BZA's acceptance of the

---

13. *See, e.g., National Cathedral Neighborhood Ass'n v. District of Columbia Board of Zoning Adjustment,* 753 A.2d 984 (D.C.2000) (athletic facilities deemed accessory to school's main purpose); *Dupont Circle Citizens Ass'n v. District of Columbia Board of Zoning Adjustment,* 749 A.2d 1258 (D.C.2000) (permitting accessory uses to other permitted accessory uses); *Citizens Coalition, supra* note 12 (power plant on university campus held to be an accessory use to the university); *Dietrich v. District of Columbia Board of Zoning Adjustment,* 320 A.2d 282 (D.C.1974) (high school gymnasium deemed an accessory use); *see also Hilton*

*Hotels Corp. v. District of Columbia Board of Zoning Adjustment,* 363 A.2d 670 (D.C.1976) (laundry facility was not an accessory use to a hotel because it was not on the same lot as the hotel).

14. In approving Georgetown's 1990 Campus Plan, the BZA also approved the power plant in concept. However, that same order expressly required the University to submit a separate application for a special exception before constructing the plant. *Citizens Coalition,* 619 A.2d at 944.

child development center in this case as an accessory use was reasonable and consistent with the regulations. The center was proposed for use exclusively by University employees and students, and was thus "for the benefit" of those persons and "clearly subordinate, incidental, and related to the principal use of the University." *Id.* at 951, 956. Furthermore, substantial evidence supports the proposition that child care centers are "customarily incidental" to a functioning college or university.[15]

■ The GRA argues nevertheless that this particular child care center is not an accessory use because it fails the "same lot" test set forth in the zoning regulations. *See* 11 DCMR § 199 ("a use customarily incidental and subordinate to the principal use, and located on the same lot with the principal use"); *Hilton Hotels, supra* note 13, 363 A.2d at 671 (facility not on same lot is not an accessory use). Specifically, because Poulton Hall stands on lot 835, in a residential neighborhood and not on Georgetown's main campus, which bears a different lot number in the District of Columbia land records (it is directly across the street), the GRA claims it cannot be deemed an accessory use to the University. This argument is unavailing. Both the Acting Zoning Administrator and the BZA interpreted "lot" in this context to mean the entire University, not just the record lot, for the purpose of its consideration as an accessory use. We uphold the BZA's ruling on this issue, since it is consistent with both the zoning regulations and our case law. *See* 11 DCMR § 199 ("A lot may or may not be the land so

recorded on the records of the Surveyor of the District of Columbia"); *Citizens Coalition,* 619 A.2d at 955 (holding that, because the proposed power plant was on a remote part of the University campus, the "same lot" requirement for accessory uses was satisfied); *see also Georgetown Residents Alliance v. District of Columbia Board of Zoning Adjustment,* 802 A.2d 359, 366 (D.C.2002) (distinguishing between "lot" and "lot of record").

We next consider whether the BZA erred in determining that such a use was permissible under the 1990 Campus Plan designation of Poulton Hall for "mixed use education/educational support"[16] as a matter of right. We find no error in the BZA's conclusion that the center was covered by this designation and that BZA approval before the permits could issue was therefore unnecessary.

At the BZA hearing, the Acting Zoning Administrator testified that "the mixed use/educational use category would leave the door open for accessory uses" and that, in her opinion and in the opinion of past Zoning Administrators, when a child development center is "introduced to an existing building, [it does] not need a special exception." The BZA held that the University "did not need to amend its campus plan to establish the child development center at Poulton Hall" because it was "permitted under the land use category of education/educational support."

Nothing in the zoning regulations states explicitly whether any particular accessory use may be allowed under a campus plan without a special exception.[17] Our case

---

15. In support of its argument that child care centers are "customarily incidental" to a university's principal use, the University submitted evidence that more than 800 colleges and universities nationwide have such centers on campus.

16. This was one of seven categories of "Future Land Use" set forth in the 1990 Campus Plan.

17. The zoning regulations provide only that a campus plan must provide "[a] description of all activities conducted or to be conducted on the campus, and the capacity of all present

law likewise contains no explicit discussion of the issue. In several cases we have considered the validity of BZA grants of special exceptions for accessory uses, *see* note 13, *supra*, and we have recognized that a special exception is necessary for accessory uses involving new construction. *See National Cathedral,* 753 A.2d at 986; *Citizens Coalition,* 619 A.2d at 947. We have also held that, under the zoning regulations, an *addition* to a university cannot be located in residential zone as a matter of right. *See Duke v. American University,* 675 A.2d 26, 27 (D.C.1996). But those cases do not discuss whether certain accessory uses, such as a child development center, are permissible as a matter of right without BZA approval. The BZA has held on prior occasions that child development centers are permitted on university campuses as a matter of right [18] so long as they are restricted to use by employees and students of the university.[19] We find nothing in the regulations that conflicts with that interpretation, at least when no new construction is involved.

We have also recognized that some flexibility is warranted in dealing with campus plans. *See Duke,* 675 A.2d at 28 (university not required to build law school at site previously approved by BZA); *Glenbrook Road,* 605 A.2d at 34 n. 8 (university could resume past use of a site without BZA approval). Realistically, this must be so, since university officials cannot predict with specificity exactly how the campus must adapt to future needs when developing a ten-year campus plan. Furthermore, the GRA has cited no case in which a

college or university was required to go before the BZA for approval when it planned to change only the use of a building and no additional construction was proposed.

We therefore hold that the BZA did not err in determining that the child development center was permissible as a matter of right under the zoning regulations.

### B. *Timeliness of the appeal as to lots 161 and 162*

■ "The timely filing of an appeal with the BZA is mandatory and jurisdictional." *Mendelson v. District of Columbia Board of Zoning Adjustment,* 645 A.2d 1090, 1093 (D.C.1994) (citations omitted). "Because the rules of the BZA contain no specific time limit on appeals, a standard of reasonableness is applied in determining whether an appeal is timely." *Id.* (citations omitted); *see Waste Management of Maryland, Inc. v. District of Columbia Board of Zoning Adjustment,* 775 A.2d 1117, 1122 (D.C.2001). Under the reasonableness standard, "the time for filing an appeal commences when the party appealing is chargeable with notice or knowledge of the decision complained of." *Id.* (citations omitted). In addition, the BZA's conclusion with regard to the timeliness of an appeal is entitled to special deference because the agency is interpreting its own internal rules of procedure. *Id.*

■ With these standards in mind, we find no error in the BZA's decision that the permits for lots 161 and 162 were not

---

and proposed campus development." 11 DCMR § 210.4(d).

18. In Zoning Commission Order No. 752, 41 D.C. Register 1201 (February 14, 1994), the Commission rejected a proposal by a member of the Council of the District of Columbia (which also had the support of several Advisory Neighborhood Commissions) that it amend

applicable regulations to provide that "any relocation of a major use within or outside the campus plan, even if to a so-called matter-of-right use, be subjected to ... [BZA] review and approval."

19. *See* BZA Order No. 14082 (February 1, 1984).

timely appealed. Those permits were issued in final form on August 28, 1996, and became appealable on that date. The GRA did not file its appeal with regard to those permits until March of 1997, approximately seven months later. Although the GRA contends that it was unaware that permits for these lots had issued at that time, there was substantial evidence from which the BZA could find that the GRA was "chargeable with notice" in August of 1996. *See Woodley Park Community Ass'n v. District of Columbia Board of Zoning Adjustment*, 490 A.2d 628, 636–637 (D.C.1985). Specifically, an ANC 2–E representative testified before the BZA that by August of 1996 the ANCs and the larger community were aware that the Acting Zoning Administrator had made her decision concerning the permits *and knew that the permits had been issued.* In addition, there was evidence that University representatives had appeared before ANC 2–E at least three times and had gone door-to-door to inform community residents of the decision.

On this record, and recognizing the deference we must give to the BZA's decision on the matter, we conclude that the seven-month delay from the issuance of the permits to the filing of an appeal was not reasonable. *See Waste Management*, 775 A.2d at 1122 (delay of "one or two months" may be reasonable (citing cases), but delay of four months probably is not); *Woodley*

*Park*, 490 A.2d at 637 (delay of one year unreasonable); *Maroney v. Friere*, 74 Misc.2d 339, 340, 343 N.Y.S.2d 183, 185 (N.Y.Sup.Ct.1973) (delay of 127 days unreasonable); *cf. Sisson v. District of Columbia Board of Zoning Adjustment*, 805 A.2d 964, 969–970 (D.C.2002) (upholding BZA decision that appeal was "timely"— *i.e.*, filed within a reasonable time—when neighboring property owner challenged the issuance of four separate construction permits on different dates from January through August, but her appeal was not filed until September; BZA ruled that "because of the cumulative, piecemeal nature of the [permit] applications, the full extent of [Mr. Sisson's] construction project could not be discerned as each individual permit was issued and therefore they must be considered as a whole").[20]

## C. *Failure to give "great weight" to ANC views*

■ The ANC with jurisdiction over the Georgetown University site, ANC 2–E, did not submit a written report expressing its views on the project and took no position on this appeal. The GRA contends, however, that the BZA was required to give "great weight" to the written recommendations of two other ANCs, ANC 2–A and ANC 3–D,[21] and that its failure to do so was reversible error. *See* D.C.Code § 1–261(d) (1999);[22] 11 DCMR § 3307.2. We disagree.

---

**20.** After this case was argued, the Zoning Commission published a proposed new regulation which would require an appeal to be filed with the BZA "within sixty (60) days from the date the person appealing ... had notice or knowledge of the decision complained of, or reasonably should have had notice or known of the decision complained of, whichever is earlier." Proposed 31 DCMR § 3112.2(a), 49 D.C. Register 4884 (May 24, 2002). Subsection (c) of the proposed regulation contains an "exceptional circumstances" provision which would permit the BZA to extend the sixty-day period, but only on a showing that "[t]he extension ...

will not prejudice the parties to the appeal ...." While this new regulation, if and when adopted, would have no effect on the present case, it does lend some modest support to our conclusion that the seven-month delay in this case was not reasonable.

**21.** ANC 2–A and ANC 3–D represent the areas encompassing George Washington and American Universities, respectively.

**22.** Recodified, as amended, as D.C.Code § 1–309.10(d)(3)(A) (2001).

The GRA bases its argument on *Neighbors United for a Safer Community v. District of Columbia Board of Zoning Adjustment*, 647 A.2d 793 (D.C.1994), in which property on the borderline between two ANC areas, 6–C and 7–B, was the subject of a proposed special exception. This court held that the views of the ANC (7–B) whose area was directly across the street from the proposed facility (which was in 6–C) were entitled to "great weight" under section 1–261. Our rationale was that the BZA's decison "affected" both ANCs "and that therefore the written reports of both ANCs ... were entitled to 'great weight.'" *Id.* at 795.

*Neighbors United* is inapposite here. Although the two ANCs that submitted recommendations may have an arguable interest in any precedent established in this case, neither Poulton Hall nor Georgetown University itself is within or adjacent to the areas of either of those ANCs. Nor were their views specifically solicited by the BZA, as was the case in *Neighbors United*. Section 1–261 provides in part that "[e]ach Advisory Neighborhood Commission ... may advise ... [the BZA] with respect to all proposed matters of District government policy ... *which affect that Commission area*" (emphasis added). This court stated in *Neighbors United* that "it would be manifestly unreasonable to conclude that the area represented by an ANC which is *physically located directly across the street from the proposed facility* for which the special exception is sought would not be affected by it." *Id.* at 797 (emphasis added). But *Neighbors United* does not expand the requirements of section 1–261 to other ANCs with *any* potential interest in the outcome of a BZA proceeding, even those in more remote parts of the city;[23] its holding is based solely on the physical proximity of the ANC area to the property at issue. Thus we hold that the BZA was not required to make these other ANCs parties to the proceedings and was under no obligation to give "great weight" to their written submissions.

### D. The BZA's Findings of Fact

██ Finally, the GRA contends that the BZA order must be reversed because it fails to comply with D.C.Code § 1–1509(e) (1999) (now § 2–509(e) (2001)), which requires an agency to make findings of fact that support its ultimate conclusions of law. The GRA claims that the BZA merely summarized the evidence and legal arguments submitted by each party and did not support its legal conclusions with factual findings.

D.C.Code § 1–1509(e) provides:

Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact.

"Generalized, conclusory, or incomplete findings are insufficient; subsidiary findings of basic fact on all material issues must support the end result in a discernible manner." *Levy*, 570 A.2d at 746. The findings in this case, while perhaps they could have been more detailed, were specific enough to meet this standard. The BZA made findings with regard to every issue that was contested and that the BZA was obliged to resolve under the zoning regulations. *See Lee v. District of Columbia Zoning Commission*, 411 A.2d 635, 638 (D.C.1980). The statute does not require anything further.

**23.** American University is approximately two miles north of Georgetown University; George Washington University is approximately two miles east.

## III

For the foregoing reasons, the order of the Board of Zoning Adjustment is in all respects

*Affirmed.*